# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 9, 2012 Session

## STATE OF TENNESSEE v. JAMES BEELER

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Washington County**
**No. 35635     Lynn W. Brown, Judge**

_____

**No. E2010-00860-SC-R11-CD - Filed November 15, 2012**

_____

We accepted this appeal to determine whether a lawyer's potential violation of the ethical rule governing communications with a person represented by another lawyer constitutes criminal contempt pursuant to Tennessee Code Annotated section 29-9-102(1), (2). Although a lawyer's violation of an ethical rule may in some circumstances constitute criminal contempt, the evidence in this case is insufficient to support the "willful misbehavior" element of the offense of criminal contempt. Therefore, we reverse the judgment of the Court of Criminal Appeals, and we vacate Mr. Beeler's conviction.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Conviction Vacated; Charge Dismissed

CORNELIA A. CLARK, J., delivered the opinion of the court, in which GARY R. WADE, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Larry R. Dillow and Katherine L. Tranum, Kingsport, Tennessee, for the appellant, James Beeler.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; John H. Bledsoe, Senior Counsel; Anthony Wade Clark, District Attorney General; and Janet Hardin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

On November 4, 2009, James Beeler, an attorney licensed to practice in Tennessee, represented Christina Thomas at a suppression hearing before the Washington County Criminal Court. Mrs. Thomas's husband and co-defendant, James Thomas, was represented by another attorney, Todd Ross.[1] As Mr. Ross was cross-examining the Thomases' minor daughter, the following incident precipitated a criminal contempt citation against Mr. Beeler.

| | |
|---|---|
| [MR. ROSS]: | And – and it's your testimony that when – when they came out of the house and got in the car the first thing they did was get this needle out and – stick it in their arms? |
| [WITNESS]: | No. They wiped their hands off. |
| [MR. ROSS]: | Okay. They wiped their hands off first and then did this? |
| [WITNESS]: | Yes. |
| THE COURT: | Could you tell what they were wiping off their hands? |
| [WITNESS]: | Uhm – it – it – it was – I think it was blood. I couldn't tell. |
| [MR. ROSS]: | And when you said, they, did – did you actually see both of them wiping things off their hands? |
| [WITNESS]: | Yes. |
| [MR. ROSS]: | And what were they using to wipe it off with? |
| [WITNESS]: | Like baby wipes or something. |
| [MR. ROSS]: | Okay. And . . . |

---

[1] The record does not indicate what charges were pending against the Thomases. However, Mr. Beeler's brief to the Court of Criminal Appeals indicates that both Thomases were charged with "aggravated assault, kidnapping, and various other offenses."

MR. BEELER:        (Whispering – indiscernible).

[MR. ROSS]:        . . . how long – how long did you guys [sit] in the driveway after they came and got in the car?

THE COURT:        Mr. Beeler, it appears to the court that you are talking to Mr. Ross' client, and I don't think you are allowed to do that without his permission, and you're doing it behind his back. Have you given Mr. Beeler permission to talk to your client?

MR. ROSS:          No. No, Your Honor.

THE COURT:        That appears to be a violation of your cod[e] – of the Code of Ethical Conduct, Mr. Beeler.

MR. BEELER:        I didn't get any response from him, Your Honor.

THE COURT:        Well, why are you talking to him if you don't want a response?

MR. BEELER:        Err[or] of judgment, Your Honor.

THE COURT:        The court reporter will type up this portion of the tape and I shall report you to the Board of Professional Responsibility. I expect better conduct than this from a member of the Bar in this district, of course, you're from another district. If you come into this district I expect you to be honest, above board and follow the rules. Do you understand me?

MR. BEELER:        Yes, sir.

THE COURT:        Proceed.

When the suppression hearing ended, the trial judge questioned Mr. Thomas under oath as to the preceding incident:

3

THE COURT:     When Mr. Beeler was questioning the young witness, [name omitted], Mr. Beeler spoke to you for a period of time, is that correct?

MR. THOMAS:     He was talking, yes, sir.

THE COURT:     What was he telling you, or asking you?

MR. THOMAS:     He was asking me a question, Your Honor.

THE COURT:     What was the question that he asked you?

MR. THOMAS:     He asked me did I go to the store during that time?

THE COURT:     And Mr. Ross has already said that was without permission of counsel. Very well. I need to get the court clerk before I make findings regarding this. So, let's take a really short recess. I've taken more recesses, and it takes me – it's a hike to get back to my office now. So, court is in recess. Although, before I recess – before I recess, I will say to Mr. Thomas, thank you, sir.

MR. THOMAS:     Yes, sir.

After a recess, the trial court denied the Thomases' motion to suppress before citing Mr. Beeler for contempt of court:

Mr. Beeler, the court is going to cite you with contempt of court. What you did in this court's presence is something that I have never seen in my entire practice of law since 1977. Mr. Ross was at the lectern examining a witness and you leaned over and talked to his client. Our Rules of Professional Responsibility provide, Rule 4.2 of Rule 8, of the Tennessee Supreme Court says, and I quote, "in representing a client a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has [the] consent of the other lawyer, or is authorized by law." Mr. Ross has said he had given no permission for you to talk to Mr. Thomas. Therefore, the court cites you for contempt of court for two things, or two provisions, Tennessee Code Annotated 29-9-102. You are cited for contempt of court for willful misbehavior in the presence of the court so as to obstruct the administration of

4

justice. We cannot have lawyers going behind another lawyer's back and talking to the client. The court's been astounded with what I saw. Also, second reason for citing under the same statute, Part II, willful misbehavior of an officer of the court in an official transaction. . . .

Having set his bond, advised him to obtain counsel, and scheduled a hearing, the trial court declined to hear from Mr. Beeler at that time:

> MR. BEELER: Your Honor, my intentions are to state that I did make that comment. It was (indiscernible) . . .
>
> THE COURT: I'm not having a hearing today. I'm setting it for hearing for you to show cause why you should not be found in contempt of court. Sheriff, take him to jail.

The record reflects that Mr. Beeler posted bond the same day.

Mr. Beeler filed a motion to dismiss, which the trial court denied after a hearing on March 1, 2010.[2] Larry Dillow represented Mr. Beeler at the hearing and argued that Mr. Beeler did not violate Rule of Professional Conduct 4.2 because Mr. Ross implicitly gave Mr. Beeler permission to speak with his client. In response, the trial judge stated that "the citation for contempt of court is not for violation of Rule 4.2. The citation for contempt is for willful misbehavior in the presence of the court so as to obstruct the administration of justice." The following colloquy then occurred as to Mr. Beeler's motion to dismiss:

> THE COURT: Paragraph 10 alleges contempt may be a sanction for a violation of Rule 4.2. That's – that's again, that's not the point. The citation it – it interferes with the complete administration of justice for a lawyer to talk improperly to another lawyer's client without permission and behind his back, literally and figuratively. That's – it's not what the – the court is addressing, so . . .
>
> MR. DILLOW: If Your Honor would, tell me specifically what willful conduct we're talking about. If it's – if it's a violation of

---

[2] Prior to the filing of this motion, Mr. Beeler filed a motion and amended motion asking that the hearing, originally set for December 18, 2009, be continued until after the Board of Professional Responsibility acted on the complaint. Although no orders are included in the record, it is clear that the hearing did not actually occur until March 1, 2010.

|                | the Code of Professional Conduct then it should initiate in the Supreme Court for jurisdiction. |
| -------------- | --- |
| THE COURT:     | Well, the disciplinary part can, but the contempt occurs in this court, this court, therefore, has jurisdiction. The willful conduct is talking to another lawyer's client which it turned out to disrupt the proceedings entirely. So, actions that disrupt this court's proceedings can be punished for contempt. |

After denying the motion to dismiss, the trial court heard Mr. Beeler's proof as to why he should not be held in contempt.[3]  Regarding Mr. Ross, Mr. Beeler testified: "To my absolute knowledge and still to my knowledge I had full complete permission to talk to his client about anything."  Asked by the court whether Mr. Ross had not been truthful in denying that he had given Mr. Beeler permission to speak with this client, Mr. Beeler answered: "I think Mr. Ross was caught by surprise and he meant as to that particular question he hadn't at that second given me permission.  I do not think he in any way meaning [sic] as an all encompassing statement of no because of everything that had transpired prior to that time."  Mr. Beeler then explained what occurred on the morning of the contempt incident:

> The morning I arrived here at the courthouse at approximately 8:30.  I was walking through the metal detectors and Mr. Ross and his client came up and started talking to me about the case.  We [sat] down out in the hallway and we talked about it until court convened; had all opportunities that morning.  We talked about it openly.  Mr. Ross left me alone with his client talking on three or four occasions.  He went to check on a case he had in civil court.  He went to talk to another attorney about, I believe, a bankruptcy matter.  He went to try that case he had in civil court, and then during the lunch hour while Your Honor was in recess we talked openly.  He also talked with my client at all times that they were here.  We had talked about everything about this case with no restrictions, no reservations of any kind or nature.  And we had talked right up to the time court convened again . . . .  So, Mr. Ross by his conduct had

---

[3] The record indicates that the District Attorney General for Washington County declined to prosecute the contempt charge.  See Black v. Blount, 938 S.W.2d 394, 402 (Tenn. 1996) (district attorney general has no duty to prosecute criminal contempt charge).  In such a case, the trial court may appoint an attorney to prosecute the charge.  Id. (citing Tenn. R. Crim. P. 42(b)).  The trial court did not appoint such an attorney in this case for reasons that are unclear.  The record also does not reflect why the Attorney General agreed to defend against the appeal.

6

given me complete permission to talk with his client, and I had given him complete permission to talk with my client which he did do.

Mr. Beeler further testified as to his interaction with Mr. Ross and Mr. Thomas in the weeks preceding the suppression hearing:

[MR. BEELER]:  I set up an appointment with Mr. Ross at his office a couple of weeks or so before this happened. We had a full complete meeting. We discussed that the defenses were the same, that everything was the same, that the act of one was the act of the other. We decided what witnesses we were hoping to call. We'd talked about dividing cross examination of witnesses, and argument of motions. We agreed that we would work together fully and cooperatively, and we never put any restrictions on this except that we would not call the other person's client and have them come to our office, that was the thing we agreed on. We agreed that we would not initiate discussions unless both of us were there, or both of us were aware of it, and that's how the thing happened.

. . . .

[MR. DILLOW]:  Did you and Mr. Ross and your client, and Mr. Ross' client, did you all have any type of conflict between you all and your joint preparation of your defenses?

[MR. BEELER]:  No, none at all. As a matter of fact, Mr. Ross' client had tried to call my office on several occasions, and I refused the call and referred him to Mr. Ross. He also did that on [an] occasion or two when he was represented by Mr. Crichton, [his] prior attorney. I also turned him away and sent him to Mr. Crichton. They – he came to my office one day with his wife. I told him I couldn't talk to him. I told him that I absolutely could not. I sent them both away. And the bottom line, his wife's explanation was they didn't know there was anything wrong with that 'cause Mr. Spurrell [her prior attorney] and Mr. Crichton talked to them interchangeably whenever. But, I have

7

not talked with them alone at any point in time. I did not talk to him that day without the permission of Mr. Ross.

The hearing was then continued until April 16, 2010, at which time Mr. Ross testified on behalf of Mr. Beeler:

[MR. DILLOW]: Did you have any objections at that time, while Mr. Beeler and your client were seated at counsel table, with Mr. Beeler talking with your client?

[MR. ROSS]: From what I understand from my client, the question that was asked of him was something that we had already been discussing that day, and it was just an affirmation that – of something that had already been talked about, and that's all he was asked. So, I mean, if Mr. Beeler had asked me is it okay to ask him that question, I certainly wouldn't have minded because we had already – we had already talked about that so . . .

. . . .

THE COURT: Well, did you – did you give Mr. Beeler permission to talk to your client during that proceeding?

MR. ROSS: I never specifically told him he had permission to talk to my client. I mean, it just – it was never asked. We never talked about that. That never came up, so specifically, no, I guess not.

. . . .

THE COURT: I asked, "Have you given Mr. Beeler permission to talk to your client?" And your answer, "No, no, Your Honor." Is there anything that you want to change about that?

MR. ROSS: No. That answer remains the same. I had not specifically given him permission to talk to my client, but I can certainly understand in the course of the case, you

8

know, we had been here for four (4), five (5), six (6) hours. I'm not sure what time it was.

THE COURT: One of those days.

MR. ROSS: And during that time several of those hours had probably been spent out there on a bench or standing outside talking. And, you know, for all that time we're standing there talking. And then during the course of her testimony I guess she said something that sparked something in his head, and he leaned over just to affirm something [he] had been told earlier. I can certainly understand how that could happen. You asked me did I specifically give him permission to talk to him. No, I didn't. Did he ask him anything that he didn't already know the answer to? No.

After hearing all the evidence, the trial court made the following findings of fact and conclusions of law:

This is a non-jury trial. The court has had an opportunity at the original proceeding on November the 4th to judge Mr. Ross' credibility, again today, and also Mr. Beeler's credibility, and they are in conflict. The court finds that Mr. Ross is credible, that when he was asked, . . . he's cross-examining a young witness, a key prosecution witness against his client. Mr. Ross indicated very emphatically, no, that he had not given Mr. Beeler permission to talk to his client. . . . And then Mr. Beeler, which didn't help his credibility, the court asked, "Well, why are you talking to him if you don't want a response?" in that colloquy. And Mr. Beeler's response is "Error of judgment." And he would have been better served to have admitted and apologized, which he never did. And we've gone through the issues of whether or not this court is enforcing the rules of the Board of Professional Responsibility, particularly, "A lawyer shall not communicate about [the] subject [of the] representation with a person a lawyer knows to be represented by another lawyer unless the lawyer has the consent of the other lawyer or is authorized by law." And Mr. Ross doesn't back away from what he said before. He says he can understand, it's something they talked about in the past, but that Mr. Beeler did not have permission. And the problem with this is under the circumstances with Mr. Ross cross-examining a key witness, the issue is whether this is willful misbehavior in the presence of the court so as

9

to obstruct the administration of justice or willful misbehavior of an officer of the court, which Mr. Beeler as an attorney is, in an official transaction. . . . And just because they may have talked about it before, in the scheme of things doesn't change that. . . . In Mr. Beeler's testimony he sort of hems and haws that, well, he had – doesn't come around and say it this way. I've got that in my notes. He gave permission by his conduct was Mr. Beeler's testimony, and that just doesn't cut it. It just doesn't cut it. . . .

The trial court sentenced Mr. Beeler to a fifty-dollar fine and a ten-day jail term that was subsequently ordered to be served on probation. Mr. Beeler appealed his conviction, arguing that the evidence does not support the "misbehavior" element of criminal contempt pursuant to Tennessee Code Annotated section 29-9-102(1), (2) (2000).

The Court of Criminal Appeals observed that the only judgment order in the record does not specify which prong of the statute the trial court found Mr. Beeler to have violated. State v. Beeler, No. E2010-00860-CCA-R3-CD, 2011 WL 5071920, at *5 (Tenn. Crim. App. Oct. 26, 2011). Concluding from the record that the trial court primarily relied upon the first ground—"willful misbehavior of any person in the presence of the court," Tenn. Code Ann. § 29-9-102(1)—the Court of Criminal Appeals found the evidence sufficient and upheld the conviction. Beeler, 2011 WL 5071920, at *5, *9. We granted Mr. Beeler permission to appeal.

**Standard of Review**

A person charged with criminal contempt is presumed innocent, and guilt must be proven beyond a reasonable doubt. Black v. Blount, 938 S.W.2d 394, 399 (Tenn. 1996); Robinson v. Air Draulics Eng'g Co., 377 S.W.2d 908, 912 (Tenn. 1964). Once convicted, however, the contemnor loses the presumption of innocence and bears the burden of overcoming the presumption of guilt on appeal. Black, 938 S.W.2d at 399; Robinson, 377 S.W.2d at 912. Thus, appellate courts do not review the evidence in a light favorable to the accused. Thigpen v. Thigpen, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993). A conviction will be reversed for insufficient evidence only when the facts in the record, and any inferences that may be drawn therefrom, are insufficient as a matter of law for a rational trier of fact to find the accused guilty of the crime beyond a reasonable doubt. Black, 938 S.W.2d at 399; Tenn. R. App. P. 13(e).

10

**Analysis**

<u>Contempt</u>

At common law, courts held vast and undefined power to punish attorneys for contemptuous acts.  <u>Black</u>, 938 S.W.2d at 397 (citing <u>State v. Galloway</u>, 45 Tenn. 326, 330 (1868); Ronald L. Goldfarb, <u>The Contempt Power</u> (1963)).  Judge James H. Peck, a Tennessee native,[4] infamously abused this power by summarily disbarring an attorney for publishing editorials critical of his opinions.  <u>Cammer v. United States</u>, 350 U.S. 399, 406 (1956) (citing Joseph Stansbury, <u>Report of the Trial of James H. Peck</u> (1833)).  In 1830, the House impeached Judge Peck, who escaped conviction in the Senate by a single vote.  <u>Id.</u> To prevent future abuses, Congress enacted the Contempt Act of March 2, 1831, ch. 99, 4 Stat. 487 (current version at 18 U.S.C. § 401 (2006)).  This statute codifies a "drastic delimitation by Congress of the broad undefined power of the inferior federal courts."  <u>Nye v. United States</u>, 313 U.S. 33, 45 (1941).

In 1831, the Tennessee General Assembly enacted similar legislation to curb the contempt power of state judges.  Act of Dec. 19, 1831, ch. 19, 1831 Tenn. Pub. Acts 34; <u>see also</u> <u>State v. Gray</u>, 46 S.W.3d 749, 750 n.1 (Tenn. Ct. App. 2000).  We have long recognized that the contempt power of Tennessee courts—though inherent and essential to the administration of justice, <u>Winfree v. State</u>, 135 S.W.2d 454, 455 (Tenn. 1940)—has been circumscribed by statute.  <u>Scott v. State</u>, 71 S.W. 824, 825 (Tenn. 1902); <u>see also</u> Tenn. Code Ann. § 16-1-103 (2009) ("For the effectual exercise of its powers, every court is vested with the power to punish for contempt, *as provided for in this code*." (emphasis added)).  The contempt statute, in relevant part, authorizes courts to punish "willful misbehavior" pursuant to the contempt power:

> Scope of Power.  The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:
> (1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;
> (2) The willful misbehavior of any of the officers of such courts, in their official transactions;
> . . . .

Tenn. Code Ann. § 29-9-102.

---

[4] Judge Peck served on the United States District Court for the District of Missouri from 1822 until his death in 1836.

11

Contempt is categorized as "direct" or "indirect," depending on whether the misbehavior occurred in the court's presence. Black, 938 S.W.2d at 398. This classification is important in criminal contempt cases because Tennessee Rule of Criminal Procedure 42 allows for a summary proceeding if the contemptuous conduct occurs before the court; but if not, certain procedural protections must be observed, including notice, a hearing, and recusal if the contempt charged involves disrespect to or criticism of the judge. Tenn. R. Crim. P. 42. Courts must scrupulously adhere to these strictures because "summary punishment departs, often dramatically, from traditional notions of due process that are the hallmarks of criminal justice." State v. Turner, 914 S.W.2d 951, 957 (Tenn. Crim. App. 1995).[5]

Courts have also recognized two species of contempt—civil and criminal. State ex rel. Anderson v. Daugherty, 191 S.W. 974, 974 (Tenn. 1917). Civil contempt is remedial in character and usually employed to compel obedience to a court order. See, e.g., Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 354 (Tenn. 2008). Criminal contempt, by contrast, is "punitive in character," Thigpen, 874 S.W.2d at 53, and is "intended to preserve the power and vindicate the dignity and authority of the law, and the court as an organ of society." Black, 938 S.W.2d at 398. We have cautioned that criminal contempt charges should be used sparingly. Robinson, 377 S.W.2d at 911-12 ("While the power to punish for contempt may and should be used in an appropriate case, it should not be used unless the case clearly calls for its exercise.").

With these principles in mind, we consider whether the evidence in this case supports the trial court's finding that Mr. Beeler engaged in "willful misbehavior" for purposes of section 29-9-102(1), (2). Although the Court of Criminal Appeals found that the trial court primarily relied upon the "willful misbehavior of any person in the presence of the court," Tenn. Code Ann. § 29-9-102(1), the record reflects that the trial court also premised the conviction upon the "willful misbehavior of any of the officers of such courts," Tenn. Code

---

[5] Summary contempt is appropriate "when there is a need to 'act swiftly and firmly to prevent contumacious conduct from disrupting the orderly progress of a criminal trial.'" Turner, 914 S.W.2d at 956 (quoting United States v. Wilson, 421 U.S. 309, 319 (1975)). Unfortunately, our courts are occasionally subjected to genuinely disruptive conduct. E.g., State v. Whetstone, No. E2010-02333-CCA-R3-CO, 2001 WL 5147795 (Tenn. Crim. App. June 28, 2011). In such cases, exercise of the summary contempt power may be necessary to restore order, but Rule 42(a) presupposes that the observed conduct is contemptuous; if the court has any doubt on this point, a summary proceeding is not the appropriate means for adjudicating the matter. In this case, the trial court substantially complied with the notice and hearing requirements of Rule 42(b) regarding indirect contempts.

Ann. § 29-9-102(2).[6]  Thus, we will consider both grounds.  However, because "willful misbehavior" is an element of criminal contempt under both subsections, we will focus on whether the facts in the record, and any inferences that may be drawn therefrom, are sufficient for a rational trier of fact to conclude beyond a reasonable doubt that Mr. Beeler engaged in "willful misbehavior."  See Black, 938 S.W.2d at 399.

The trial court premised the contempt charges and conviction on Mr. Beeler's alleged violation of Tennessee Supreme Court Rule 8, Rule of Professional Conduct 4.2:

> Rule 4.2.  Communication with a Person Represented by Counsel. — In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.[7]

Mr. Beeler concedes that he communicated with a person he knew to be represented by another lawyer, and he has not disputed that his communication pertained to the subject matter of the representation; however, Mr. Beeler vigorously contends that he had the effective consent of the other lawyer by virtue of their close cooperation in preparing a joint defense.  Mr. Beeler reasons that his entirely ethical conduct cannot constitute "willful misbehavior" for purposes of contempt.

---

[6] Criminal contempt may also be premised upon "[t]he willful disobedience or resistance of any [court] officers, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of [the] courts." Tenn. Code Ann. § 29-9-102(3).  For purposes of this statute, we have held that Tennessee Supreme Court Rule 9 is a standing order of this Court, the willful violation of which may constitute criminal contempt.  Doe v. Bd. of Prof'l Responsibility, 104 S.W.3d 465, 472 (Tenn. 2003).  However, we also held that any charge of contempt based upon Rule 9 must be filed in this Court because trial courts lack jurisdiction to vindicate the orders of this Court. Id. at 474.  Although the parties to this appeal dispute the holding and applicability of Doe to Mr. Beeler's alleged violation of a provision of Tennessee Supreme Court Rule 8, the trial court clearly premised the contempt charge against Mr. Beeler solely on the "misbehavior" subsections of the contempt statute.  See Tenn. Code Ann. § 29-9-102(1), (2).  Accordingly, we need not discuss the third subsection or Doe in this opinion.

[7] This version of Tennessee Supreme Court Rule 8, Rule of Professional Responsibility 4.2, effective March 1, 2003, has been slightly revised, effective January 1, 2011: "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."

13

The principle that not every ethical violation is criminal contempt of court can be traced to Ex parte Robinson, 86 U.S. (19 Wall.) 505 (1873). In that case, the target of an unserved grand jury subpoena promptly left town upon speaking with a lawyer. The judge ordered the lawyer to show cause why he should not be punished for contempt. When the lawyer declared, "I shall answer nothing," the judge summarily disbarred him. The Court noted that the Contempt Act of 1831 authorized courts to punish contempt with fines or imprisonment, but "the power to disbar an attorney proceeds upon very different grounds." Id. at 512. This is not to say that unethical conduct and contemptuous misbehavior are unrelated:

> While we acknowledge that a court's power to discipline or disbar an attorney "'proceeds upon very different grounds' from those which support a court's power to punish for contempt," [citing Cammer, 350 U.S. at 408 n.7 (quoting Ex parte Robinson, 86 U.S. (19 Wall.) at 512)], we consider and apply ethical benchmarks when determining whether an attorney's conduct is inappropriate to his role and thus constitutes contumacious misbehavior.

United States v. Thoreen, 653 F.2d 1332, 1340 (9th Cir. 1981). In Thoreen, the Ninth Circuit chastised defense counsel for disguising a witness as his client and seating him at the defense table—an overzealous tactic the court deemed unethical, but not necessarily contemptuous. Id.

State courts have also held that conduct is not contemptuous solely because an ethical rule forbids it. State v. Long, 844 P.2d 381, 385 (Utah Ct. App. 1992) ("[A] criminal contempt conviction requires more than an attorney's violation of an ethical duty."); People v. Wolf, 514 N.E.2d 1218, 1220 (Ill. App. Ct. 1987) ("A violation of the Code [of Professional Conduct] does not [per se] constitute a criminal offense."). Reviewing cases, the Long court held that "violation of an ethical duty will support a criminal contempt conviction . . . *only if the ethical impropriety also impinges upon the integrity of the court*." 844 P.2d at 385 (emphasis added).

Tennessee also recognizes this distinction. As already noted, the criminal contempt power is "intended to preserve the power and vindicate the dignity and authority of the law, and the court as an organ of society." Black, 938 S.W.2d at 398. On the other hand, the Rules of Professional Conduct "are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." Tenn. Sup. Ct. R. 8, ¶ 15. The Board of Professional Responsibility is charged with investigating alleged grounds for discipline and taking appropriate action. Tenn. Sup. Ct. R. 9, § 5.5. Although a court retains "such powers as are necessary for that court to maintain control over proceedings conducted before it, such as the power of contempt," Tenn. Sup. Ct. R. 9, § 1.2, we have cautioned that

14

this power should be used sparingly. Robinson, 377 S.W.2d at 911-12 ("While the power to punish for contempt may and should be used in an appropriate case, it should not be used unless the case clearly calls for its exercise."). Cf. In re McCune, 717 P.2d 701, 709 (Utah 1986) ("The focus and purpose of the [ethical] rule and the [criminal contempt] statute are different. They operate in separate spheres. There is, therefore, no conflict."), abrogated on other grounds by Monson v. Carver, 928 P.2d 1017, 1027 n.7 (Utah 1996). Thus, unethical conduct *may* amount to criminal contempt, but only if the conduct also "embarrasses, hinders, or obstructs a court in its administration of justice or derogates the court's authority or dignity, thereby bringing the administration of law into disrepute." Black, 938 S.W.2d at 399.[8]

In this case, Mr. Beeler argues that even if an ethical violation may be punished as criminal contempt, the question he posed to Mr. Thomas was not unethical because Mr. Ross had impliedly consented to such communications. Because the trial court premised the contempt citation upon what *it* determined to be an ethical violation, Mr. Beeler reasons that his entirely ethical behavior cannot support a conviction for criminal contempt under either of the "willful misbehavior" grounds cited by the court. Again, we must consider whether the facts in the record, and any inferences that may be drawn therefrom, are sufficient for a rational trier of fact to conclude beyond a reasonable doubt that Mr. Beeler engaged in "willful misbehavior." See Black, 938 S.W.2d at 399.

Few of our precedents address the "willful misbehavior" grounds for criminal contempt, e.g., Robinson, 377 S.W.2d at 911-13, and we have not defined the exact contours of "willful misbehavior" for this purpose. As the United States Supreme Court has recognized, "'willfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears." Bryan v. United States, 524 U.S. 184, 191 (1998) (citing Spies v. United States, 317 U.S. 492, 497 (1943)).[9] We

---

[8] Even if unethical conduct does not rise to the level of criminal contempt, a judge still may have a duty to report it to the Board of Professional Responsibility. See Tenn. Sup. Ct. R. 10, RJC 2.15(B) ("A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question regarding the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate authority."); id. at 2.15(D) ("A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Rules of Professional Conduct shall take appropriate action."). Appropriate action includes, but is not limited to, "communicating directly with the lawyer who may have committed the violation, or reporting the suspected violation to the appropriate authority or other agency or body." Id. at cmt. 2.

[9] As illustrated by the following exchange between Judge Learned Hand and Professor Herbert Wechsler, the reporter for the Model Penal Code, some legal experts would prefer to eliminate "willfully" from statutes defining criminal offenses:

have used the phrase "willful misconduct" interchangeably with "willful misbehavior." Black, 938 S.W.2d at 401. Additionally, in the contempt context, we recently reaffirmed that "willful disobedience or resistance . . . to any lawful writ, process, order, rule, decree, or command of [the] courts," Tenn. Code Ann. § 29-9-102(3), entails an *intentional* violation of a known duty for both civil and criminal contempt. See In re Sneed, 302 S.W.3d 825, 826 n.1 (Tenn. 2010) (published order) (criminal contempt for "willful" violation of court order, Tenn. Code Ann. § 29-9-102(3)); Konvalinka, 249 S.W.3d at 357 (civil contempt for "willful" violation of court order, Tenn. Code Ann. § 29-9-102(3)); cf. Mitchell v. Fayetteville Pub. Utils., 368 S.W.3d 442, 449 (Tenn. 2012) ("[T]he willful misconduct defense [in workers' compensation cases] was intended to preclude recovery for intentional violations of established rules or policies.").

The parties to this appeal do not dispute the meaning of "willful," however, for purposes of Tennessee Code Annotated section 29-9-102(1), (2). In particular, Mr. Beeler avers that "willful" means "intentional," as defined by statute. See Tenn. Code Ann. § 39-11-302(a) ("'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result."). While Mr. Beeler argues that it was not his conscious objective or desire to engage in the conduct, we have little difficulty concluding otherwise—the evidence plainly demonstrates that Mr. Beeler knew what he was saying and to whom he was speaking. However, Mr. Beeler's argument that his conduct, even if "willful," did not entail "misbehavior," is convincing.

We derive a statute's meaning by considering it as a whole, CAO Holdings, Inc. v. Trost, 333 S.W.3d 73, 86 (Tenn. 2010), "because words are known by the company they keep." State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle, 63 S.W.3d 734, 754-55 (Tenn. Ct. App. 2001) (citing Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon, 515 U.S. 687, 694 (1995)). In the contempt statutes at issue in this appeal, the General Assembly chose to use "willful *mis*behavior"—not "willful behavior."

Judge Hand: [Willfully is] an awful word! It is one of the most troublesome words in a statute that I know. If I were to have the index purged, "wilful" would lead all the rest in spite of its being at the end of the alphabet.

Professor Wechsler: I agree with you Judge Hand, and I promise you unequivocally that the word will never be used in the definition of any offense in the Code. But because it is such a dreadful word and so common in the regulatory statutes, it seemed to me useful to superimpose some norm of meaning on it.

American Law Institute, Model Penal Code § 2.20, at 249 n.47 (1985).

16

The evidence is simply insufficient to support the trial court's finding that Mr. Beeler engaged in "willful misbehavior."

The trial court relied heavily on its initial colloquy with Mr. Ross: "Have you given Mr. Beeler permission to talk to your client? No. No, Your Honor." We are mindful that the trial court found the testimony of Mr. Ross credible and in conflict with that of Mr. Beeler. We will not reweigh the evidence, but much of the testimony offered at the subsequent contempt hearing is simply not in conflict. Mr. Ross testified that he and Mr. Beeler had closely cooperated on the defense of their clients, which included several hours of joint discussion on the morning of the suppression hearing. Indeed, Mr. Ross testified that although he had not explicitly given Mr. Beeler permission to speak with his client at the moment he posed the question, both attorneys had spoken openly with each other's clients about the case—including the subject matter of the question—just hours before the hearing. Moreover, Mr. Ross testified that he would have permitted Mr. Beeler to ask his client the question had Mr. Beeler sought his permission. Finally, Mr. Ross testified that he understood how Mr. Beeler could have believed express permission was unnecessary, because Mr. Beeler spoke with Mr. Thomas about the case for several hours that morning—both in and out of the presence of Mr. Ross—without objection.

Likewise, Mr. Beeler testified that he and Mr. Ross spoke openly together and with their clients about their defense for several hours on the morning of the hearing. Mr. Beeler also testified that he and Mr. Ross had agreed to cooperate weeks earlier and that they had placed no restrictions on communicating with each other's client, except that neither attorney would meet with the other's client in his office without the other attorney. Moreover, Mr. Beeler testified that he honored this agreement by sending away Mrs. Thomas—his own client—when she came to his office with Mr. Thomas. The trial court continued to rely heavily on Mr. Ross's original answer to the first question asked of him during the suppression hearing, but Mr. Ross qualified and clarified that first answer in his subsequent testimony. Furthermore, the record does not demonstrate that Mr. Beeler's conduct embarrassed, hindered, or obstructed the trial court in the administration of justice, nor that it derogated the trial court's authority or dignity. See Black, 938 S.W.2d at 399.

Although we do not review the evidence in a light favorable to the accused, we nevertheless conclude that the evidence in the record is insufficient to support the trial court's determination that Mr. Beeler engaged in "misbehavior," for purposes of Tennessee Code Annotated section 29-9-102(1), (2). Accordingly, we reverse the judgment of the Court of Criminal Appeals and vacate Mr. Beeler's conviction.

Recusal of Trial Judge

In both the Court of Criminal Appeals and before this Court, Mr. Beeler has asserted that the trial judge sua sponte should have recused himself from conducting the contempt hearing. The Court of Criminal Appeals rejected this argument because Mr. Beeler neither requested recusal of the trial judge, nor raised any objection at the hearing.[10] Beeler, 2011 WL 5071920, at *8. Having found the evidence insufficient to support Mr. Beeler's conviction, we need not address this issue.[11]

**Conclusion**

Although a lawyer's violation of an ethical rule may in some circumstances amount to criminal contempt, on the record before us, Mr. Beeler's potential violation of the ethical rule governing communications with a person represented by another lawyer does not constitute criminal contempt pursuant to Tennessee Code Annotated section 29-9-102(1), (2) because the evidence of "willful misbehavior" is insufficient to support his conviction beyond a reasonable doubt. Therefore, we reverse the Court of Criminal Appeals, and we vacate Mr. Beeler's conviction. Costs of this appeal are taxed to the State.

_____

CORNELIA A. CLARK,  JUSTICE

---

[10] Issues involving recusal have always been held to rest soundly within the discretion of the judge whose recusal is sought. Bd. of Prof'l Responsibility v. Slavin, 145 S.W.3d 538, 546 (Tenn. 2004). "The failure to seek recusal in a timely manner may result in the waiver of any complaint concerning the judge's impartiality." Bean v. Bailey, 280 S.W.3d 798, 803 (Tenn. 2009); see also Black, 938 S.W.2d at 401 (recusal not required where the contempt charge "does not, on its face, involve disrespect or criticism of the trial judge." (citing Tenn. R. Crim. P. 42(b)(4) ("When the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the hearing, except with the defendant's consent."))).

[11] Effective July 1, 2012, a motion for recusal, where not otherwise required by law, must be made in writing and granted or denied in writing, Tenn. Sup. Ct. R. 10B, § 1.01 ("Any party seeking disqualification, recusal, or a determination of constitutional or statutory incompetence of a judge of a court of record, shall do so by a timely filed written motion."), and Tennessee Supreme Court Rule 10, Rule of Judicial Conduct 2.11(D) now provides: "Upon the making of a motion seeking disqualification, recusal, or a determination of constitutional or statutory incompetence, a judge shall act promptly by written order and either grant or deny the motion. If the motion is denied, the judge shall state in writing the grounds upon which he or she denies the motion."