IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 3, 2023

## JAMES WILLIAMS ROSE ET AL. v. PATRICK M. MALONE

**Appeal from the Chancery Court for Williamson County**
**No. 19CV-48249     Michael Binkley, Judge**

_____

**No. M2022-01261-COA-R3-CV**

_____

Grandparents brought a criminal contempt petition against Father for alleged violations of a grandparent visitation order. After a bench trial, the trial court found the father guilty on all 23 counts of criminal contempt and sentenced him to the maximum sentence of 10 days per count to be served consecutively. Of the 230 days, 140 days were suspended, with a sentence of 90 days of actual confinement. Father raises multiple challenges on appeal to every count and also challenges the sentences imposed. We affirm 11 of the counts, reverse 12 of the counts, and remand for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part and Affirmed in Part and Vacated in Part; Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and CARMA DENNIS MCGEE, JJ., joined.

Daniel A. Horwitz, Lindsay Smith, and Melissa K. Dix, Nashville, Tennessee, for the appellant, Patrick M. Malone.

Ashley Goins Alderson, Rebecca McKelvey Castañeda, and Thomas A. Dozeman, Nashville, Tennessee, for the appellees, James William Rose and Jennie Adams Rose.

**OPINION**

I.

A.

This criminal contempt appeal arises out of a contentious relationship between the

maternal grandparents and the father of a minor child and is contested over the father's adherence or lack thereof to various aspects of a grandparent visitation order. The roots of the parties' division trace back at least as far as 2017 when Patrick M. Malone ("Father") and Katherine R. Malone ("Mother") divorced. Together, they had one child, B.R.M., born in 2012. After the divorce, Mother was named the primary residential parent and awarded 319 days of parenting time. Father received 46 days. Just three months later, though, Mother was tragically killed in an accident. During the highly emotional time that followed, sharp rifts opened between the parties, eventually leading the maternal grandparents James William Rose and Jennie Adams Rose ("Grandfather" and "Grandmother", respectively, and "Grandparents", collectively) to file a petition for grandparent visitation in April 2019. After a trial in October 2020, the trial court entered an order granting visitation to Grandparents ("Visitation Order").

The Visitation Order provides as follows:

1. **Visitation.** Grandparents shall have in-person visitation with [B.R.M.], every year, at the following times:

■ Mother's Day weekend, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday;

■ Up to ten (10) consecutive days in July. Grandparents shall notify Father, in writing, of their proposed dates for this visitation time no later than May 15 of each year;

■ The weekend closest to Mother's birthday in September, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday;

■ The weekend prior to Thanksgiving, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday.

2. **Location.** The location for Grandparents' visitation shall be any location of their choosing. The place of exchange shall be Father's residence, unless otherwise agreed. Grandparents shall be responsible for making any necessary transportation arrangements for [B.R.M.], and shall be responsible for all costs associated with transportation and visitation. Grandparents shall provide to Father, in writing, a detailed itinerary for their visits, no later than three (3) days prior to the beginning of their visits.

3. **FaceTime.** Grandparents shall be allowed one (1) FaceTime call with [B.R.M.] each week, at 7:00 p.m. on Sunday for thirty (30) minutes unless otherwise agreed. Father will facilitate these FaceTime calls.

4. **Extracurricular Activities.**  Upon written request from Grandparents, Father shall promptly provide to Grandparents an updated written schedule of [B.R.M.]'s extracurricular activities which are open to attendance by the public or by family members, including sporting events, school functions such as Grandparents' Day, and Chapel.  Grandparents shall provide to Father at least forty-eight (48) hours' written notice of their intent to attend any of [B.R.M.]'s extracurricular activities.

(a)  In the event [B.R.M.] has any regularly-scheduled extracurricular activity during Grandparents' visitation time, Grandparents shall either: (i) facilitate [B.R.M.]'s attendance at her scheduled activities; or (ii) forego their visitation.

(b) In the event [B.R.M.] has any regularly-scheduled extracurricular activity during the time for Grandparents' weekly FaceTime Call, Father shall notify Grandparents in writing of an alternative time for their weekly call.

5. The parties remain free to supplement or modify this visitation schedule by written agreement.

The Visitation Order does not define any of its terms.  After the trial court entered the Visitation Order, Father appealed, arguing the trial court erred in awarding visitation to Grandparents.  This court affirmed in *Rose v. Malone*, No. M2021-00569-COA-R3-CV, 2022 WL 2914644, at *14 (Tenn. Ct. App. July 25, 2022) (*Rose I*).

Entry of the Visitation Order did not resolve the acrimony between the parties. The parties' continuing conflict and allegations related to Father failing to adhere to the terms of the Visitation Order resulted in the filing of a criminal contempt petition by Grandparents against Father.  On February 2, 2022, the Grandparents filed a petition asserting twenty counts of criminal contempt in the Williamson County Chancery Court. The trial court ordered Father to appear for a hearing on the petition on February 10, 2022.  Father failed to appear.  On February 15, 2022, the court entered a bodily attachment order and required Father's attendance at a February 24, 2022 hearing on the petition.  Again, Father failed to appear.  On March 13, 2022, the court entered a second bodily attachment order for a hearing set for March 24, 2022.  When Father failed to appear once again, the trial court entered a third bodily attachment order on April 1, 2022, setting the hearing for April 13, 2022.  Yet another bodily attachment order was entered on April 5, 2022, which, unlike all the previous related orders, incorrectly stated that Father was facing potential civil contempt.  Father finally did appear.  A bench trial was eventually held on August 4, 2022.  The trial court not only addressed Grandparents' original twenty counts but also three additional counts related to Father's repeated failure to appear in response to court orders.

- 3 -

The trial court heard testimony from Grandfather and Grandmother. Father elected not to testify. In addition to testimony from Grandparents, documentary evidence was also presented at the trial. Counsel for Grandparents and Father, respectively, dueled over each of the counts contesting whether Father had violated the Visitation Order. Each of the counts and some of the testimony are addressed below:

*Count 1: Summer Visitation*

The first Count alleged that Father willfully violated the summer visitation provision of the Visitation Order, interfering with Grandparents' right to ten days of visitation in the summer of 2021. That portion of the Visitation Order stated that Grandparents shall receive "[u]p to ten (10) consecutive days in July. Grandparents shall notify Father, in writing, of their proposed dates for this visitation time no later than May 15 of each year."

Text messages introduced at trial show that Grandfather sent a text message to Father on March 25, 2021, providing the proposed dates for their summer visitation. Grandfather provided the dates of July 21 through July 31 and planned to take B.R.M. to a family cabin in Idaho. Father responded, "I thought I picked those dates." Grandfather then sent a copy of the relevant portion of the Visitation Order, to which Father replied, "[B.R.M.] isn't going to the cabin this summer. We're appealing the decision." Father did not offer any alternative dates or indicate any particular reason why those dates were more problematic than any other ten-day period in July.

No other discussion about summer visitation occurred until May 29, 2021, when Grandfather sent a follow-up text reminding Father of the summer visitation and indicating that a detailed itinerary would be sent soon. Father did not respond. A little over one month later, on July 4, Father replied and said that B.R.M. had tennis lessons during the proposed summer visitation and attached a copy of a different portion of the Visitation Order related to extracurricular activities. This portion states, "[i]n the event [B.R.M.] has any regularly-scheduled extracurricular activity during Grandparents' visitation time, Grandparents shall either: (i) facilitate [B.R.M.]'s attendance at her scheduled activities; or (ii) forego their visitation."

On July 16, Grandfather followed up with more details and, on July 18, asked for information about the tennis lessons. On July 23, Father informed Grandfather that the lessons were on Tuesdays at 4:30, which would fall right in the middle of the visitation. Father then said he would be willing to accommodate local visitation instead, as long as B.R.M. did not miss the tennis lesson. On July 25, Grandfather responded that he believed the "spirit of the order" suggested that the Grandparents had a right under the

Visitation Order to take B.R.M. to the cabin if they wished. Given their failure to accommodate B.R.M.'s tennis lesson, Father indicated that he understood the Grandparents to be foregoing their visitation under the extracurricular activities provision quoted above.

Grandfather testified that he did not think this was a misunderstanding. Rather, he believed Father was intentionally withholding visitation. Grandfather then testified that he is also the trustee for a trust set up to support B.R.M. Father can submit reimbursement requests related to certain activities to the trust. Grandfather stated that Father submitted a receipt for tennis lessons for the first time on July 20, just one day before the proposed visitation. The receipt indicated that the lesson was only thirty minutes long. Grandfather indicated that this showed that Father intentionally scheduled the lesson during the visitation period to interfere with Grandparents' ability to take B.R.M. to the cabin in Idaho. During cross-examination, however, Grandfather admitted that B.R.M. did take other tennis lessons after that first one in July. He also agreed that they would have to accommodate extracurricular activities under the Visitation Order, but that he believed it was not logical to interpret it to mean that a lesson could interfere with their summer visitation.

*Count 2: Violation of the Order to Enforce Summer Visitation*

After Father indicated that B.R.M. could not go to Idaho during the proposed summer visitation dates due to her tennis lesson, the Grandparents brought a motion to enforce the summer visitation provision of the Visitation Order. The trial court held a hearing on that motion on July 29, 2021. There is no transcript from that hearing.

The trial court entered an order on July 30, 2021, in which it made the following findings:

1. The Grandparents are entitled to have the summer visitation time designated in the February 5, 2021 Grandparent Visitation Order.

2. Pursuant to the Visitation Order, the Grandparents are entitled to travel with the Child during their summer visitation.

3. The Court found that it is not modifying the order, but is explaining what the court meant in the Order regarding the summer visitation.

4. It was not the Court's intention for the Grandparents' travel plans during their scheduled summer visitation to be interrupted by the child's extracurricular activities.

5. It is interesting that Father first stated that Grandparent Visitation would

- 5 -

not be occurring in Idaho while an appeal was pending.

6. It is interesting that Father's pattern of not responding to the Grandparents' communication is the same pattern that was demonstrated at trial.

7. It is interesting that Father then claimed, only after the Court denied his Motion for a Stay of the Visitation Order, that the child had tennis lessons that would interfere with the visitation July 21-31, 2021.

8. A tennis lesson could have been rescheduled.

9. Father's reliance on a tennis lesson as a basis for why the visitation could not go forward, or could not go forward in the location selected by the Grandparents, seems like a ruse to avoid the Grandparents having the assigned time.

10. The Grandparents are entitled to make up their summer visitation from Friday, July 30, 2021, at 5:00 p.m. to Monday, August 9, 2021, at 5:00 p.m.

It is, therefore, ORDERED, ADJUDGED, AND DECREED that the Grandparents shall be, and are hereby, entitled to exercise summer visitation with the child from Friday, July 30, 2021, at 5:00 p.m. to Monday, August 9, 2021, at 5:00 p.m.

On July 29, after the hearing but before the order was entered, Grandfather sent a text to Father informing him that he intended to pick B.R.M. up at 5:00 p.m. the following day and providing an itinerary. Father responded, "No. I'll save you a trip. I'm not going to accommodate visitation outside of the dates you provided in May." Grandmother texted Father and asked whether Father had considered the new order. Father acknowledged it, but stated that requiring visitation on twenty-four hours' notice was unjust. He again refused to allow the visitation. The summer visitation did not take place. Count 2 is addressed to Father's failure to adhere to the Order to Enforce Summer Visitation.

*Count 3: Thanksgiving Visitation*

The third Count relates to the Grandparents' planned visitation the weekend before Thanksgiving 2021. The Visitation Order provided that the Grandparents shall have visitation "[t]he weekend prior to Thanksgiving, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday." The visitation could take place at "any location of their choosing."

- 6 -

In 2021, the weekend before Thanksgiving was Friday, November 19 to Sunday, November 21. Grandfather testified that on November 9, 2021, he texted Father to see if B.R.M. had any upcoming swim competitions. Father responded that she did not have any swim meets scheduled in the near future. Two days later, on November 11, Grandfather texted the itinerary for the upcoming pre-Thanksgiving visitation. He said that the Grandparents intended to pick B.R.M. up in Kansas City at 5:00 p.m. on Friday, then drive straight through to Springfield, Tennessee, for an annual holiday 5K run on Saturday. Grandparents' daughter, B.R.M.'s mother, had been part of a Springfield running group, which included a number of women who had been friends of Mother's. The group remembered Mother in formal and informal ways each year in connection with the event. The group would then have dinner with friends in Nashville before returning B.R.M. to Kansas City by Sunday at 5:00 p.m.

The next day, November 12, Father responded that B.R.M. had swimming lessons on Friday evening, so the earliest they could pick her up would be 8:00 or 8:30 after the lesson was over. Over the next few days, there was some discussion over text about whether the Grandparents could take B.R.M. to the lesson themselves or if they had to pick her up from Father's house. Then, on November 18, Father stated that the itinerary was vague and questioned if they planned to spend half of their time with B.R.M. in the car and whether they planned for her to sleep in the car Friday night as they drove eight hours to Tennessee. The morning of November 19, the day the visitation was set to begin, Grandfather responded that he would "encourage" her to sleep in the car. Father responded, "[d]riving all night isn't safe and [B.R.M.] isn't sleeping in a car tonight." Referencing this safety concern, Father said that the Grandparents could either spend the time with her locally or fly to Tennessee.

Grandfather responded that Father had known of the plan to drive since at least October. Grandfather added that he believed the swim lesson was scheduled just to interfere with the visitation, causing them to have to drive even later into the night than originally planned. Father explained that B.R.M. wanted to take swimming lessons because she wanted to join a competition team, so the scheduling of her lesson had nothing to do with visitation. He also found a direct flight to Nashville that would be, in his view, a safer transportation option. In his testimony, Grandfather noted a problem about ticket availability. He also expressed concern about the timing of the flights making it impossible for B.R.M. to be in Springfield in time for the 5k race.

Father made it quite clear that B.R.M. "will not be sleeping in a car this evening." He reiterated that they could spend the visit with B.R.M. locally, stating, "[t]hese are safe and reasonable options, so if you'd still like to spend the weekend with [B.R.M.] then let me know which works best." Grandfather responded to clarify if Father was refusing the visitation altogether, even after the swim lesson, asking, "So . . . 'no' to 5:30 AND 8:30?" Father did not respond. Grandfather testified that Father's concerns were more strategic than genuine and were misplaced. With plans already made to meet with friends, the

Grandparents drove to Tennessee without B.R.M.

*Count 4: Destination Asia Event*

Counts 4 through 10 all relate to the extracurricular activities provision of the Visitation Order, which, as noted above, states,

4. **Extracurricular Activities.** Upon written request from Grandparents, Father shall promptly provide to Grandparents an updated written schedule of [B.R.M.]'s extracurricular activities which are open to attendance by the public or by family members, including sporting events, school functions such as Grandparents' Day, and Chapel. Grandparents shall provide to Father at least forty-eight (48) hours' written notice of their intent to attend any of [B.R.M.]'s extracurricular activities.

Count 4 arises from the Destination Asia event at B.R.M.'s school. At trial, Grandfather testified that on or around April 4, 2021, during a FaceTime call with B.R.M., the Grandparents learned of an event at B.R.M.'s school called Destination Asia that had recently taken place. No evidence was presented addressing the nature of the Destination Asia event was other than it was an event at B.R.M.'s school.

*Count 5: Spring Soccer Schedule*

Count 5 relates to B.R.M.'s spring 2021 soccer schedule. Grandfather testified that on March 29, 2021, he texted Father asking for details on B.R.M.'s upcoming soccer season. Getting no response, Grandfather followed up on April 5. Father responded on April 9 with a typed list of the scheduled games. This list included the dates and start times for each game, the first of which Father said was the following day, April 10 at 11:45. The next day, the Grandparents arrived at the game at 11:45 and discovered that it did not start until 12:45, so they waited one hour and watched the game. Grandfather testified that the start time of the next game, set for April 17, was also one hour later than on the list provided by Father. On April 17, before the game began, Father informed the Grandparents that he was pulling B.R.M. out of soccer for the rest of the season, so she only actually played in the April 10 game that the Grandparents attended. There was no testimony as to why she discontinued playing soccer for the spring 2021 season. Grandfather did testify that he spoke directly to the soccer coach and learned that all of the start times provided by Father were slightly wrong. The Grandparents believe that Father purposely provided the wrong times. There was no testimony as to when Father received the schedule and what the times were on any schedule that Father may have received.

*Count 6: Fall Soccer Schedule*

Count 6 involves the soccer schedule for the fall 2021 season. The petition for contempt as to Count 6 is addressed to the language in the Visitation Order requiring Father to "promptly" provide a schedule of events. Grandfather testified that he requested details about fall 2021 soccer schedule and any other upcoming extracurricular events on August 24, 2021. On August 31, he followed up. Father responded that he did not yet have the soccer schedule and that he knew of no other upcoming extracurricular events that the Grandparents would be able to attend. On September 8, Grandfather followed up again. Father responded with a copy of the schedule and a message that said, "[e]njoy it while you can." The first game was three days later, on September 11. The Grandparents did not miss any games, but Grandfather testified that he did not believe that Father provided the schedule promptly. Again, there was no testimony as to when Father received the schedule.

### *Count 7: Swim Schedule*

Regarding Count 7, Grandfather testified that he texted Father on November 9, 2021, indicating that he understood there was a swim meet coming up and asked for the schedule. Father responded that there was no swimming that week and no meets were scheduled yet. Father added that there might be some scheduled in the future after the Thanksgiving holiday. No schedule was ever provided. There was also no testimony that any swim meet involving B.R.M. ever took place. Grandfather admitted on cross-examination that he had no knowledge of any missed swim meets. Additionally, testimony was provided that indicated that the swim club had a restrictive Covid policy that did not allow attendance by the public or even family members at swim practices.

### *Count 8: Winter Basketball*

Count 8 involves B.R.M.'s winter 2021/2022 basketball schedule. In a text on November 12, among text messages about the Thanksgiving visitation, Father stated that he would need to check if B.R.M. had a basketball game scheduled during that weekend. Father indicated that he would provide schedule information for the upcoming basketball games as soon as he had it. Father failed to follow through on providing information related to upcoming basketball games until February 1, 2022. The information provided was in response to a January 31, 2022 text in which Grandfather asked again for the basketball schedule. Father sent a copy of the schedule the next day. Upon looking at the schedule, the Grandparents discovered that they had already missed four games.

### *Count 9: Curriculum Day*

Count 9 involves an event at B.R.M.'s school called "Curriculum Day." At trial, Grandmother testified that a school calendar showed that there was an event on September 16, 2021, that the Grandparents could have attended. Father did not inform them of the event. The evidence at trial included a text message from Grandfather asking

for any upcoming events.  Father responded on August 31, 2021, stating that he did not know of any upcoming extracurricular events that the Grandparents could attend.  There was no testimony describing the nature of the Curriculum Day event.

*Count 10: School Carnival*

Count 10 involves the School Carnival.  The school calendar for B.R.M.'s school listed this event as being on Friday, September 17, 2021. It was open to students' families.  Prior to this event, Grandparents had in writing requested information regarding upcoming extracurricular events.  Father had indicated on August 31 that he did not know of any upcoming events that the Grandparents could attend.  Starting at 3:00 p.m. on Friday September 17, 2021 and running through Sunday at 5:00 p.m., under the terms of the Visitation Order, Grandparents had visitation scheduled with B.R.M.  Father informed them, however, that B.R.M. would not actually be available at 3:00 p.m. and instead Grandparents would have to wait until 5:00 p.m.  Upon picking her up, Grandparents learned that there had been a carnival that day at B.R.M.'s school during the time that they were originally set to pick up B.R.M.  Grandparents also learned that B.R.M., instead of being picked up at the originally set time under the terms of the Visitation Order, had attended the carnival with her paternal grandmother.  Father knew that Grandparents were going to be in-town for their scheduled visitation with B.R.M.  Despite Grandparents' request for information about upcoming extracurricular events, he provided them no information about the School Carnival.

*Counts 11-20: Missed FaceTime Calls*

Counts 11 to 20 all involve the FaceTime provision of the Visitation Order, which, as noted above, states:

> Grandparents shall be allowed one (1) Facetime call with [B.R.M.] each week, at 7:00 p.m. on Sunday for thirty (30) minutes unless otherwise agreed.  Father will facilitate these Facetime calls.

There is no definition of "facilitate" provided in the order.

Each of the counts arises from a FaceTime call that did not occur.  These included missed FaceTime calls on February 7, 2021 (Count 11), February 14, 2021 (Count 12), July 12, 2021 (Count 13), November 21, 2021 (Count 14), December 26, 2021 (Count 15), January 2, 2022 (Count 16), January 9, 2022 (Count 17), January 16, 2022 (Count 18), January 23, 2022 (Count 19), and January 30, 2022 (Count 20).  With regard to each of these counts, the trial court made the following finding:

> The Court finds that the proof submitted by the Petitioners proves each and every element of criminal contempt beyond a reasonable doubt with respect

to this count. The Court further finds that the meaning of "facilitate" is clear. The facilitator, one in charge of facilitating, the definition is invite the right people to the meeting; help the participants prepare for the meeting ahead of time; work with the meeting to identify the objectives of the meeting and the purpose of the meeting. The Court put the burden on Father to facilitate, set up, and conduct these meetings. It is his obligation. Father is guilty of criminal contempt on this count . . . .

The definition of facilitate that appears in the trial court's findings of fact and conclusions of law in the Contempt Order does not appear in the trial court's Visitation Order, which leaves the term "facilitate" undefined.

Both Grandfather and Grandmother testified that they never attempted to place a FaceTime call. They expected Father to place the call because the Visitation Order states that he will "facilitate."

For the February 14, 2021 call (Count 12), Grandfather texted Father before the scheduled time provided for in the Visitation Order regarding the weekly FaceTime call. The message stated "Just quick reminder: Waiting for 7:00 FT. Thanking you in advance." Father did not respond to this text for four days, and he never made up this missed call. Similarly, for the January 2, 2022 call (Count 16), Grandfather texted, during the scheduled time for the call, "Will we be getting a FT call from [B.R.M.] this evening? Please text or simply FT Jennie's number." Father did not respond to this text. Similarly, for the January 30, 2022 call (Count 20), Grandfather, during the scheduled time for the call, texted "Will we be getting a FT call from [B.R.M.]this evening? Please text or simply FT Jennie's number." With regard to the January 9, 2022 missed FaceTime call (Count 17), in a text on January 5, 2022, Father contacted Grandfather to indicate that the paternal grandparents would not assist with the phone calls between B.R.M. and Grandparents. Therefore, Father indicated "[i[f I'm not present then it'll have to wait. Currently traveling for work, but I'll let you know when I'm back in town and schedule a call." Father failed to follow up on scheduling the call or making up the missed call.

*Counts 21-23: Failure to Appear*

Counts 21 through 23 were added after the Grandparents' filing of their petition for criminal contempt on February 2, 2022. On February 3, 2022, the trial court ordered Father to appear on February 10, 2022. On February 15, 2022, the trial court issued an Order for Bodily Attachment and to Appear directing Father to appear on February 24, 2022. On March 12, 2022, the trial court ordered Father to appear on March 24, 2022. The trial court concluded that notice had been provided to Father as to each of these orders.

- 11 -

Regarding each of the failure to appear counts, the trial court also found the following:

> [T]he docket was called. Father was not present when the docket was called. Usually when a party or their lawyer is not present when their case is first called, the Court will rotate that case to the end of the docket to give the party and/or his or her lawyer additional time to appear. The Court does this for everyone and has no reason to believe it did not do so in this matter. Father never appeared, nor did anyone on his behalf. There was no phone call, no letter, no email, no notice, nothing to let the Court know that Father would not be present. Accordingly, the Court finds Father willfully failed to abide by the Court's Order to Appear and that each and every element of criminal contempt has been met beyond a reasonable doubt as to the violation of [the respective order to appear.]

The orders to appear were issued on February 3, 2022, February 15, 2022, and March 12, 2022, respectively.

## C.

After hearing the testimony of Grandparents and after confirming that Father was electing to exercise his right not to testify, the trial court ruled upon each of the 23 counts. The trial court found each had been proven beyond a reasonable doubt. The trial court sentenced Father to the maximum ten days for each, to be served consecutively. Of the 230 days of incarceration, 90 days would be actual incarceration and the remaining 140 would be suspended.

In addition to finding Father guilty on all 23 counts, the trial court made several other findings. It found both Grandfather and Grandmother to be extremely credible. The court stated that it perceived Father's actions to be "gaming of the system" and that his statements in the text message evidence indicated a "very bad attitude." It found Father's failure to appear in response to court orders to do so to "represent a whole other line of disrespect for the Court." The judge said, "Father should have followed the Court's Order. There appears to be a bad motive here . . . ." Regarding the sentence, the court clarified that 90 days would be served day-for-day and the remaining 140 would be suspended, contingent upon Father's strict compliance with the Court's Order in the future. The court stated that it was likely to award the Grandparents' attorney's fees upon their filing of requested fees. Finally, the trial court set the bond at $30,000 pending appeal.

Father timely appealed the trial court's final order, raising the following issues:

1. Whether, for each Count, the Trial Court applied an erroneous legal

standard for willfulness by failing to consider whether Father's omissions were intentional.

2. Whether the orders giving rise to Father's convictions for Counts 1 and 3-20 were clear, specific, and unambiguous.

3. Whether, as to any Count, Grandparents introduced sufficient evidence to prove that the omissions underlying Father's contempt convictions were undertaken for a bad purpose.

4. Whether, as to any Count, Grandparents introduced sufficient evidence to prove that the omissions underlying Father's contempt convictions were intentional.

5. Whether Grandparents proved that Father violated the Court's visitation Orders as to Counts 1 and 3-20.

6. Whether Father was convicted in contravention of his right to a trial by jury.

7. Whether Father's conviction must be vacated due to notice defects.

8. Whether the Trial court erred by sentencing Father consecutively.

9. Whether the trial court imposed an excessive sentence as to each Count and an excessive collective sentence.

10. Whether the trial court erred by sentencing Father to a term of confinement.

## II.

Before delving into Father's specific arguments on appeal, in framing the discussion that follows, we note the recognition of an inherent power of courts to impose punishment for contempt, which can be traced in common law back to the twelfth century and which "has long been regarded as essential to the protection and existence of the courts." *Baker v. State*, 417 S.W.3d 428, 435 (Tenn. 2013). This inherent power has been codified and limited in Tennessee. *State v. Beeler*, 387 S.W.3d 511, 519 (Tenn. 2012). Under Tennessee Code Annotated section 29-9-102:

The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:

- 13 -

. . .
(3) The willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts . . . .

Tenn. Code Ann. § 29-9-102. The punishment for contempt is a fine up to $50, imprisonment up to ten days, or both. Tenn. Code Ann. § 29-9-103.

Criminal contempt may further be subdivided into direct or indirect; contempt is direct when it occurs in the court's presence and indirect when it does not. *Beeler*, 387 S.W.3d at 520. While a court may take summary action for direct contempt, indirect contempt requires additional procedural safeguards. *Id.* "For example, indirect criminal contempt may only be punished after the accused contemnor has been given notice and an opportunity to respond to the allegations at a hearing." *Baker*, 417 S.W.3d at 436 (footnote omitted). "While criminal contempts may arise in the course of private civil litigation, such proceedings, 'in a very true sense raise an issue between the public and the accused.'" *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996) (quoting *State v. Daugherty*, 191 S.W. 974, 974 (1917)).

Criminal contempt requires proof of the following elements:

First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

*Furlong v. Furlong*, 370 S.W.3d 329, 336-37 (Tenn. Ct. App. 2011) (quoting *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354 (Tenn. 2008) and applying its standards in the context of criminal contempt).

Once an adjudication of guilt has been entered on a count alleging criminal contempt, "the contemnor loses the presumption of innocence and bears the burden of overcoming the presumption of guilt on appeal." *Beeler*, 387 S.W.3d at 519. The reviewing court gives the prevailing party the strongest legitimate view of the evidence and all reasonable and legitimate inferences to be drawn from the evidence. *Furlong*, 370 S.W.3d at 338. On appeal, this court determines whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Cottingham v. Cottingham*, 193 S.W.3d 531, 538 (Tenn. 2006); *see Beeler*, 387 S.W.3d at 519; *Black*, 938 S.W.2d at 399.

III.

Turning to Father's bases of appeal, we begin with Father's argument that the trial court applied the wrong standard in assessing whether his conduct was willful. He notes that willfulness in the context of criminal contempt requires proving intent and a culpable state of mind. Father contends the trial court did not include intent as part of its analysis of whether his conduct qualified as willful. In support of this contention, he quotes a portion of the trial court's order wherein the trial judge states the following:

> Willfulness, in the context of criminal contempt, connotes a culpable state of mind. In a criminal context, a willful act is one undertaken for a bad purpose. The case law is clear on the definition of willfulness.

Father is correct insofar as intent is required to prove criminal contempt. *Nolan v. Nolan*, No. W2021-01018-COA-R3-CV, 2023 WL 4559883, at *19 (Tenn. Ct. App. July 17, 2023) (stating that "[w]ith regard to willfulness, '[i]n the context of criminal contempt, willfulness has two elements: (1) intentional conduct and (2) a culpable state of mind" (quoting *Neely v. Neely*, No. E2017-01807-COA-R3-CV, 2019 WL 2929074, at *2 (Tenn. Ct. App. July 8, 2019)))).[1]

Father's argument that the trial court did not consider intent as part of assessing willfulness, however, is unavailing. Immediately after the language that is quoted above from the order, "The case law is clear on the definition of willfulness," the trial court added the following "*See Konvalinka v. Chattanooga Hospital County Hospital Authority*, No. E2006-00064-SC-R11-CV (Tenn. February 13, 2008) and *Furlong v. Furlong*, No. E2010-02456-COA-R4-CV (Tenn. Ct. App. October 14, 2011)." Both *Konvalinka*[2] and *Furlong*,[3] which the trial court cited as setting forth the applicable

---

[1]

Willful misconduct for criminal contempt "entails an intentional violation of a known duty." *Beeler*, 387 S.W.3d at 523. Accordingly, "[i]n the criminal context, a willful act is one undertaken for a bad purpose[,]" *Furlong*, 370 S.W.3d at 340 (quoting *Konvalinka*, 249 S.W.3d at 357), or more specifically, with the specific intent to do some forbidden act, *Konvalinka*, 249 S.W.3d at 357; *see Beeler*, 387 S.W.3d at 523-24 (finding an attorney's act willful when it was "his conscious objective or desire to engage in the conduct").

*Nolan*, 2023 WL 4559883, at *19.

[2]

The fourth issue focuses on the willfulness of the person alleged to have violated the order. The word "willfully" has been characterized as a word of many meanings whose construction depends on the context in which it appears. *Spies v. United States*, 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418 (1943); *United States v. Phillips,* 19 F.3d 1565, 1576-77 (11th Cir. 1994). Most obviously, it differentiates between deliberate and unintended conduct. *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d at 612. However, in criminal law, "willfully" connotes a culpable state of

- 15 -

standard, provide for intent being required to establish criminal contempt in Tennessee. Furthermore, this court has noted that an act that is "undertaken for a bad purpose" is an intentional act. *Levoy v. Levoy*, No. M2018-01276-COA-R3-CV, 2019 WL 6331247, at *3 (Tenn. Ct. App. Nov. 26, 2019) (stating that "[a]n act is undertaken for a 'bad purpose' when the actor has 'the specific intent to do something the law forbids'" (quoting Konvalinka, 249 S.W.3d at 357)). Simply stated, the trial court's order does not indicate or suggest that its understanding of willfulness did not require intent. Accordingly, we see no basis for concluding that the trial court failed to apply the proper standard in assessing criminal contempt.

IV.

Father asserts, as to Counts 1 and 3-20, that the terms of the Visitation Order were not clear, specific, and unambiguous in relation to his conduct that was found to be criminally contemptuous of the trial court's Visitation Order. If Father is correct, this would require reversal as to these counts because to find criminal contempt based upon violation of a court order, the court's order that was violated must "be clear, specific, and unambiguous." *Konvalinka*, 249 S.W.3d at 355; *see Long v. McAllister-Long*, 221 S.W.3d 1, 14 (Tenn. Ct. App. 2006) (requiring a clear and unambiguous order in a case involving criminal contempt).

> Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of civil[4] contempt. Orders need not be "full of superfluous terms and specifications adequate to Counter any flight of fancy a contemner may imagine in order to declare it vague." They must, however, leave no reasonable basis for doubt regarding their meaning.

---

mind. In the criminal context, a willful act is one undertaken for a bad purpose. *Bryan v. United State*s, 524 U.S. 184, 191, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998); *State v. Braden*, 867 S.W.2d 750, 761 (Tenn. Crim. App. 1993) (upholding an instruction stating that "[a]n act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids").

*Konvalinka*, 249 S.W.3d at 356-57.

[3] *Furlong*, 370 S.W.3d at 341 (concluding that "the amended order of protection is so lacking in clarity as to warrant our holding that Husband could not be held to have intentionally violated it").

[4] While *Furlong* leaves the reference to civil contempt from *Konvalinka* in place, *Furlong* itself was applying these standards to criminal contempt. *Furlong*, 370 S.W.3d at 336 ("*Konvalinka* is a case involving civil contempt, but, with the noted exception of the standard for reviewing the sufficiency of the evidence, it is clear to us that the following analysis set out in *Konvalinka* applies to all contempt proceedings.").

Orders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed. Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge. Determining whether an order is sufficiently free from ambiguity to be enforced in a contempt proceeding is a legal inquiry that is subject to de novo review.

*Furlong*, 370 S.W.3d at 337 (quoting *Konvalinka*, 249 S.W.3d at 356 (citations omitted)); *see also*, *e.g.*, *Lehmann v. Wilson*, No. M2023-00232-COA-R3-CV, 2024 WL 901426, at *3 (Tenn. Ct. App. Mar. 4, 2024); *Stark v. Stark*, No. W2021-01288-COA-R3-CV, 2023 WL 5098594, at *8 (Tenn. Ct. App. Aug. 9, 2023), *perm. app. denied* (Tenn. Feb. 13, 2024); *Nolan*, 2023 WL 4559883, at *15.

Analogized to more conventional criminal law matters, Father's argument is more akin to a rule of lenity rather than a void for vagueness contention.[5] In his argument mirroring the rule of lenity, the language of the court's prior orders parallels the statutory language in a more conventional rule of lenity analysis. Father contends the trial court read restrictions in its Visitation Order in a manner that resolved ambiguity against, rather than in favor of, the person facing the contempt charge. In doing so, Father contends the trial court departed from the manner in which criminal contempt is supposed to be assessed under Tennessee law.

Such an argument is entirely appropriate in challenging a criminal contempt finding because the threat of punishment in a criminal contempt proceeding "triggers the same concerns that motivate the rule of lenity."[6] This type of argument is also entirely

---

[5]

The rule of lenity has been described as "as a sort of 'junior version of the vagueness doctrine.'" *United States v. Lanier*, 520 U.S. 259, 266 (1997). This characterization stems in part from the vagueness doctrine being a constitutional doctrine that results in striking down a law as unconstitutional while the rule of lenity is a rule of statutory construction that results in a stricter construction of a statute. *See* Carissa Byrne Hessick & Joseph E. Kennedy, *Criminal Clear Statement Rules*, 97 Wash. U. L. Rev. 351, 368-69 (2019). The void-for-vagueness doctrine "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). "Run-of-the-mill ambiguity regarding particular applications of a criminal statute . . . does not warrant application of the void-for-vagueness doctrine"; instead, that is addressed via the rule of lenity. *See Martin v. State*, 259 So.3d 733, 741 (Fla. 2018).

*Nolan*, 2023 WL 4559883, at *15 n.24.

[6] *Nolan*, 2023 WL 4559883, at *15 & n.25 (quoting F. Andrew Hessick & Michael T. Morley,

consistent with the Tennessee Supreme Court's directive that "[a]mbiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge." *Konvalinka*, 249 S.W.3d at 356. The assessment of ambiguity in considering this issue relates to the application of the terms of an order to the circumstances of the particular count. With this understanding in mind, we consider the challenged counts.

As noted above, Father challenges his convictions under Counts 1 and 3–20 on this basis. Father does not challenge Count 2, 21, 22, or 23 on this basis. Having concluded, for reasons addressed in section V below, that Counts 4, 5, 6, 7, and 9 are subject to reversal on another basis, we do not address these counts in Section IV of this opinion. We agree with Father's contention that the Visitation Order is ambiguous with regard to its application as to Counts 1, 11, 13, 14, 15, 18, and 19. Accordingly, Father's convictions as to each of these counts is reversed. Regarding Counts 3, 8, 10, 12, 16, 17, and 20, Father's argument is unavailing. We address each count below.

*Count 1: Summer Visitation*

Count 1 involves the intersection between the summer visitation and the extracurricular activities provisions of the Visitation Order. Father argues ambiguity exists for two reasons. First, he points to the language of the summer visitation provision which requires the Grandparents to provide their "proposed dates" for summer visitation to Father by May 15 of each year. Father argues that the inclusion of the word "proposed" implies that the dates are not final and simply set by Grandparents' fiat. Rather, he reads that language "proposed" to mean that he has some power to approve or reject the particular dates proposed by the Grandparents.

In terms of application to the present case, Father sent a text message to Grandfather in March 2021 saying that he believed the Visitation Order gave him final say over the particular dates for the summer visitation. Grandparents, on the other hand, argue that they get to choose the dates of the summer visitation.

As for the second asserted basis of ambiguity, Father points to the interplay between the summer visitation provision and the extracurricular activities provision, which states that, "In the event [B.R.M.] has any regularly-scheduled extracurricular activity during Grandparents' visitation time, Grandparents shall either: (i) facilitate [B.R.M.]'s attendance at her scheduled activities; or (ii) forego their visitation." Father argues that this means that any regularly scheduled extracurricular activity takes precedence over the Grandparents' visitation, requiring either accommodation or foregoing of visitation.

---

*Interpreting Injunctions*, 107 Va. L. Rev. 1059, 1086 (2021)).

After reviewing the language of the Visitation Order, with regard to the circumstances of Count 1, we agree with Father that the trial court's Visitation Order is subject to "more than one reasonable interpretation." *See Furlong*, 370 S.W.3d at 337. The Visitation Order provides that Grandparents "shall have in-person visitation with [B.R.M.], every year" for "[u]p to ten (10) consecutive days in July." However, as to which specific ten days in July, the Visitation Order provides that Grandparents are to notify Father by no later than May 15 of their "their proposed dates for visitation."

Merriam-Webster defines "proposed" in several ways, including as relevant to the Visitation Order, "to form or put forward a plan or intention," and "to set forth for acceptance or rejection."[7] Similarly, Black's Law Dictionary defines "proposal" as "[s]omething offered for consideration or acceptance; a suggestion," and "[t]he act of putting something forward for consideration."[8] These definitions do not point to an unambiguous and clear conclusion that an authorization via the Visitation Order to propose dates is the equivalent of possessing an authority to make a final determination as to the specific dates. To the contrary, the use of the word propose implies the possibility of an acceptance or rejection of the proposal. Father is correct that the provision allowing the Grandparents to give "proposed dates" to Father by May 15 of each year can reasonably be read to mean that Father has some ability to accept or reject, not summer visitation in July, but the particular "proposed" dates in July.

Irrespective of the specific dates in July, it is clear, however, that the Grandparents had a right to summer visitation in July. This right under the Visitation Order is definitive and not ambiguous. The Visitation Order states "Grandparents shall have in-person visitation with [B.R.M.], every year, at the following times: . . .Up to ten (10) consecutive days in July." Father did not respond to Grandparents' dates proposal by suggesting or inviting alternative dates but instead by expressing opposition to summer visitation entirely irrespective of which days in July. Father's conduct raises the question of whether this ambiguity of application regarding the proposal language would be a sufficient basis for him to avoid criminal contempt. After all, the Visitation Order is clear that Grandparents have a right to summer visitation for ten days in July. We need not ultimately answer this question, though, because there is a second critical ambiguity that is ultimately fatal as to a finding of criminal contempt based upon Father's conduct with regard to Count 1.

Under the terms of the Visitation Order, when B.R.M. "has any regularly-scheduled extracurricular activity during Grandparents' visitation time," the Visitation

_____

[7] *Propose*, Merriam-Webster's Dictionary, available at https://www.merriam-webster.com/dictionary/propose.

[8] *Proposal*, Black's Law Dictionary (11th ed. 2019).

- 19 -

Order provides that "Grandparents shall either (i) facilitate [B.R.M.]'s attendance at her scheduled activities or (ii) forego their visitation."  Pursuant to the Visitation Order, the Grandparents have visitation at the following times:

- Mother's Day weekend, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday;

- Up to ten (10) consecutive days in July. Grandparents shall notify Father, in writing, of their proposed dates for this visitation time no later than May 15 of each year;

- The weekend closest to Mother's birthday in September, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday;

- The weekend prior to Thanksgiving, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday.

The time period in which Grandparents either have to facilitate B.R.M.'s attendance at her scheduled activities or forego visitation, therefore, includes the disputed summer visitation time period at issue in Count 1.

On appeal, the Grandparents argue that the tennis lesson that interfered with their summer 2021 visitation was not regularly scheduled because B.R.M.'s first session for her tennis lessons was during the proposed visitation time period.  The Grandparents' understanding of "regularly-scheduled" is problematic in seeking to support a finding of criminal contempt.  The language of the Visitation Order states that "[i]n the event [B.R.M.] has any regularly-scheduled extracurricular activity during Grandparents' visitation time," the Grandparents must either accommodate the extracurricular activity or forego.  Just as the trial court used the word "shall" for Grandparents' right to visitation in July, the trial court also used the word "shall" with regard to Grandparents' obligation to facilitate or forego visitation.  Father presented the Grandparents with precisely this choice of accommodating B.R.M.'s tennis lessons or foregoing visitation.

The Visitation Order does not itself define "regularly".  Merriam-Webster defines "regularly" as "in a regular manner" and "on a regular basis: at regular intervals."  As an adjective, "regular," in turn and relevant part, is defined by Merriam-Webster as "recurring, attending, or functioning at fixed, uniform, or normal intervals."[9]

---

[9]  *Regularly*, Merriam-Webster's Dictionary, available at https://www.merriam-webster.com/dictionary/regularly; *Regular*, Merriam-Webster's Dictionary, available at https://www.merriam-webster.com/dictionary/regular.

The evidence was clear that B.R.M. continued tennis lessons after the first one for a series of scheduled lessons, indicating that the tennis lessons were regularly scheduled, with the regular intervals beginning from the time period of Grandparents' proposed July visitation. There was even testimony indicating that tennis lessons occurred in November, long past the summer visitation.

The Visitation Order did not provide that the extracurricular activities that would impact visitation had to be during an ongoing activity that had already met multiple times; rather, the Visitation Order simply required that the activity must be regularly scheduled. There is a first time for every regularly scheduled extracurricular activity, and nothing in the Visitation Order unambiguously or clearly indicates that the first session of a regularly scheduled extracurricular activity does not fall within the limitation established by the Visitation Order. The trial court's Visitation Order neither limited its extracurricular activity to previously scheduled activities nor did the Visitation Order impose a limitation requiring cooperation from Father to avoid scheduling such activities during summer visitation. The Visitation Order did not clearly or unambiguously exclude the first session of an extracurricular activity that would include multiple subsequent sessions from the definition of "regularly scheduled." That Father's scheduling of a new regularly scheduled activity during summer visitation may be obnoxious does not render it a criminally contemptuous violation of a court order.

*Count 3: Thanksgiving Visitation*

Father also argues that the guilty verdict for Count 3 must be reversed because the terms of the Visitation Order related to the visitation at Thanksgiving are not clear. The Visitation Order states that the Grandparents shall have visitation with B.R.M. the weekend before Thanksgiving from 3:00 p.m. Friday to 5:00 p.m. Sunday. The Visitation Order also states that the location of visitation "for Grandparents' visitation shall be any location of their choosing." Furthermore, the Visitation Order provides that the Grandparents "shall be responsible for making any necessary transportation arrangements for [B.R.M.], and shall be responsible for all costs associated with transportation and visitation." Finally, it requires Grandparents to provide Father with an itinerary at least three days before the visitation.

Nevertheless, Father argues that the language of the Visitation Order is unclear because it does not specify who has the final say over the mode of transportation. He contends that, "[w]ithout clarity on the matter, Father reasonably understood that he had authority to reject proposed transportation" that he felt was unsafe. He goes on to state that because the Order does not give the Grandparents final say over transportation, it can be inferred that Father has this authority.

We disagree. There is no ambiguity in the text. Under the Visitation Order, the Grandparents have the authority to choose the location of the visitation, and the trial court

clearly specified that Grandparents were "responsible for making all necessary transportation arrangements." Nowhere in the Visitation Order is Father given any role in approving the Grandparents' transportation plans for Thanksgiving vacation. If Father believed that such a provision should have been added to the Visitation Order, he was certainly free to seek alteration thereof, but he was not free to unilaterally elect not to comply with the clear terms of the Visitation Order. If Father believed that Grandparents' travel plans were dangerous, he was aware of them in sufficient time to seek judicial relief, but again, he was not free to unilaterally elect to not comply with the clear terms of the Visitation Order. Simply stated, the Visitation Order plainly gave the Grandparents control over transportation arrangements in connection with the Thanksgiving visitation. Therefore, we find Father's argument as to Count 3 unavailing.

*Counts 4-7 & 9: Various Extracurricular Activities*

There is a close relationship between the arguments Father presents in challenging the ambiguity of the Visitation Order and his sufficiency of the evidence related challenges as to Counts 4, 5, 6, 7, and 9. We ultimately conclude that Father's convictions on these counts warrant reversal for reasons related to his sufficiency of evidence arguments. We pretermit discussion of Father's ambiguity argument as to Counts 5, 6, and 7. As for Counts 4 and 9, we address Father's ambiguity argument in the context of addressing his sufficiency of the evidence argument in Section V below.

*Count 8: Winter Basketball*

Father raises two challenges to the ambiguity of the Visitation Order as applied to his conviction under Count 8. One, Father suggests an ambiguity as to what is meant by the Visitation Order's obligation that he "promptly" provide the schedule of extracurricular events. Two, Father asserts that ambiguity in the Visitation Order gives rise to uncertainty as to whether a written request from Grandparents imposes upon Father "a continuing, indefinite, future obligation to furnish a schedule, once he ultimately received it, that Father did not have at the time the request was made." Upon these bases, Father argues that the application of the Visitation Order to Count 8 is mired in ambiguity.

We do not necessarily disagree with Father that these are potential bases of ambiguity. However, even if were to assume for purposes of argument that ambiguities as to the application of the Visitation Order exist regarding what constitutes acting "promptly" with regard to providing extracurricular scheduling information and as to the extent of Father's responsibility to provide continuing updates with regard to future extracurricular activities, his arguments would still not be availing with regard to the circumstances of Count 8.

In other words, whatever ambiguity of application exists potentially as to some

hypothetical set of circumstances, such ambiguity is not present with regard to the application of the Visitation Order to the actual circumstances underlying Count 8. Father waiting until after four of B.RM.'s basketball games had been played before apprising Grandfather of the times of any of her basketball games is certainly not prompt. Additionally, whatever uncertainty may exist as to Father's duties to provide continuing updates as future extracurricular events arise, Father and Grandfather had a specific text exchange that unambiguously indicated Father understood Grandfather's written request to be referring B.R.M.'s Winter basketball games and Father indicated that he would provide the schedule. Father's duty under the Visitation Order in relation to the circumstances underlying Count 8 is clear.

*Count 10: School Carnival*

The bulk of Father's ambiguity-related argument as to Count 10 is more accurately characterized as a sufficiency of the evidence challenge. We address Father's sufficiency challenge to Count 10 in Section V below. The ambiguity argument that Father raises with regard to Count 10 is predicated upon the failure of the Visitation Order to define the term "promptly." This argument is unavailing, however, with regard to Count 10 for a number of reasons including because Father never provided any information about this event. He failed to provide information about the event despite, as is discussed in more detail in Section V below, rescheduling Grandparents' visitation schedule with B.R.M., thereby accommodating B.R.M.'s attendance at the School Carnival. Father did so without informing Grandparents about this extracurricular event. Father did so despite knowledge Grandparents were going to be in town during the time of the School Carnival for their scheduled visitation with B.R.M. Whatever ambiguity may exist in certain theoretical applications in relation to what constitutes "promptly," it is clear that Father did not act promptly in relation to the circumstances underlying Count 10.

*Counts 11-20: Missed FaceTime Calls*

Father also argues that the criminal contempt guilty verdicts as to Counts 11-20 must be reversed because the Visitation Order does not clearly indicate what Father must do to "facilitate" a FaceTime call. The Visitation Order provides as follows: "FaceTime. Grandparents shall be allowed one (1) FaceTime call with [B.R.M.] each week, at 7:00 p.m. on Sunday for thirty (30) minutes unless otherwise agreed. Father will facilitate these FaceTime calls."

The Visitation Order does not define what it means to "facilitate." In his brief, Father offers multiple definitions of "facilitate" to demonstrate that the provision is ambiguous in this context. Black's Law Dictionary defines "facilitate" as "[t]o make the occurrence of (something) easier; to render less difficult."[10] Similarly, it defines

_____
[10] *Facilitate*, Black's Law Dictionary (11th ed. 2019).

"facilitator" as "[s]omething that helps a process take place" or "[s]omeone who helps a group of people engage in discussions or work together."[11]  Additionally, Merriam-Webster's Dictionary defines "facilitate" as "to make (something) easier," "to help bring (something) about."[12]

Grandparents argue that the trial court offered further clarity with regard to expectations by providing Father with an example orally in relation to the FaceTime provision of the Visitation Order.  According to Grandparents, the trial court offered as an example of facilitation that Father place the call and hand the phone over to B.R.M.  Assuming the trial court orally provided this example, it is not set forth in the written Visitation Order.[13]  Furthermore, there is no indication that such an approach was set forth by the trial court, even orally, as a required means of facilitation rather than simply an example of one way to satisfy the Visitation Order's FaceTime facilitation requirements.

In its Contempt Order finding Father guilty of criminal contempt, the trial court did *ex post facto* define "facilitate" as follows:

> The Court further finds that the meaning of "facilitate" is clear.  The facilitator, one in charge of facilitating, the definition is invite the right people to the meeting; help the participants prepare for the meeting ahead of time; work with the meeting to identify the objectives of the meeting and the purpose of the meeting.  The Court put the burden on Father to facilitate, set up, and conduct these meetings.  It is his obligation.

While there are aspects of the trial court's definition of "facilitate" that seem to not quite fit with facilitating a FaceTime call between Grandparents and B.R.M., a more foundational concern is that we cannot agree this definition, provided after the alleged violation, is unambiguously the meaning of "facilitate" in the trial court's Visitation Order.

Under the Visitation Order, Father is clearly required to help with the calls as a result of his duty to facilitate them, but that does not necessarily require him to be the one

---

[11] *Facilitator*, Black's Law Dictionary (11th ed. 2019).

[12] *Facilitate*, Merriam-Webster's Dictionary, available at https://www.merriam-webster.com/dictionary/facilitate.

[13] It is "well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts—and that the appellate court reviews the trial court's written orders." *Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015) (internal citations and footnote omitted).

who actually places the call, which is, in general, his purported deficiency in accordance with the evidence presented. His facilitating the calls is consistent with answering the call and handing the phone to B.R.M. or with making sure that B.R.M. answers calls when received. Furthermore, even the trial court's definition of "facilitate" in its Contempt Order does not unambiguously require Father to be the one to place the FaceTime calls.

Nevertheless, Grandparents argue that Father knew that "facilitate" meant that he was supposed to make the Facetime calls because he often placed the calls connecting Grandparents and B.R.M. Father's initiation of these calls does not mean the word "facilitate" as used in this context actually means "initiate." The word certainly does not unambiguously task Father with placing the calls.

While there is testimony that Grandparents anticipated that Father would be the one to place the call and hoped that he would, the evidence did not establish that the parties arrived at a clear understanding that it would be Father's responsibility to place the calls as his way of facilitating these FaceTime calls between B.R.M. and Grandparents. To the contrary, in a text exchange dating after the latest missed phone call referenced in the contempt petition, Father noted that he and B.R.M. had "[w]aited for your call this evening and never heard from you." Grandfather in response stated, "Sorry for confusion. Order says you place call (or facilitate) as in all past calls." This exchange occurred in February 2022 with the last call at issue in the contempt petition being January 30, 2022. The evidence does not establish that the parties had a clear mutual understanding that Father would place all of the FaceTime calls. And, as noted above, the Visitation Order does not direct Father to place the calls. Facilitating could simply be making sure that Grandparents' call was answered and B.R.M. was available for this weekly FaceTime call.

While we are not persuaded that the Visitation Order unambiguously required Father to place the call in order to facilitate a FaceTime call and the evidence does not establish that the parties had settled upon a mutual understanding that Father would do so in order to facilitate the calls, there are four contempt counts where Father's conduct clearly constituted a failure to facilitate. With regard to these four calls, Father's transgressions are not mired in ambiguity of application, but instead there exists a clear violation of the requirement to facilitate the FaceTime calls.

For the February 14, 2021 call (Count 12), Grandfather texted Father before the scheduled time provided for in the Visitation Order regarding the weekly FaceTime call. The message stated "Just quick reminder: Waiting for 7:00 FT. Thanking you in advance." Father did not respond to this text for four days, and he never made up this missed call. While Father may not unambiguously be required to place the call in order to facilitate a FaceTime call between Grandparents and B.R.M., his failure to take any action in response to Grandfather's text constituted a failure to facilitate the call on

- 25 -

February 14, 2021. Similarly, for the January 2, 2022 call (Count 16), Grandfather texted, during the scheduled time for the call, "Will we be getting a FT call from [B.R.M.] this evening? Please text or simply FT Jennie's number." Father did not respond to this text at all. Again, while Father may not unambiguously be required to place the call in order to facilitate a FaceTime call between Grandparents and B.R.M., Father's failure to call in response to this inquiry or respond to this message at all clearly constitutes a failure to facilitate the FaceTime call on January 2, 2022. Similarly, for the January 30, 2022 call (Count 20), Grandfather, again during the scheduled time for the call, texted "Will we be getting a FT call from [B.R.M.] this evening? Please text or simply FT Jennie's number." Again, irrespective of whether Father is required to place the FaceTime calls in general, Father's failure to call or respond to this message plainly constitutes a failure to facilitate a FaceTime call on January 30, 2022.[14]

The fourth FaceTime call as to which a failure of facilitation is clearly established is the January 9, 2022 call (Count 17). With regard to the January 9, 2022 call, in a text on January 5, 2022, Father contacted Grandfather to indicate that paternal grandparents would not assist with the phone calls between B.R.M. and Grandparents. Therefore, Father indicated "[i]f I'm not present then it'll have to wait. Currently traveling for work, but I'll let you know when I'm back in town and schedule a call." Father, however, failed to follow up on scheduling the call nor did Father make up the missed call. Simply stated, Father failed to facilitate the January 9, 2022 call.

For the reasons discussed above, with regard to the FaceTime counts (11-20), we reverse the criminal contempt convictions for Counts 11, 13, 14, 15, 18, and 19. We find Father's argument unavailing, however, as to Counts 12, 16, 17, and 20.

V.

Multiple issues raised by Father in his briefing on appeal are ultimately directed towards attacking the sufficiency of the evidence to support Father's convictions for criminal contempt including on the basis of a purported lack of willfulness and a lack of intent. Having determined that Counts 1, 11, 13, 14, 15, 18, and 19 are subject to reversal in connection with the ambiguity of the terms of the Visitation Order as applied to the particular circumstances of the present case, we pretermit discussion of these in terms of sufficiency of the evidence.

In considering Father's arguments, as noted above, once an adjudication of guilt has been entered on a count alleging criminal contempt, "the contemnor loses the

---

[14] With regard to the July 12, 2021 phone call, the contempt petition alleges that Grandparents contacted Father prior to the time of the FaceTime call, but it does not appear that any evidence was actually presented to this effect either in the testimony from the Grandparents or in the documentary evidence. The documentary evidence also appears to indicate that this call may have been placed while the Grandparents were on a boat; thus that may be the basis for why the call was not received.

presumption of innocence and bears the burden of overcoming the presumption of guilt on appeal." *Beeler*, 387 S.W.3d at 519. The reviewing court gives the prevailing party the strongest legitimate view of the evidence and all reasonable and legitimate inferences to be drawn from the evidence. *Furlong*, 370 S.W.3d at 338. On appeal, this court determines whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Cottingham*, 193 S.W.3d at 538; *see Beeler*, 387 S.W.3d at 519; *Black*, 938 S.W.2d at 399.

With regard to Counts 2, 3, 8, 10, 12, 16, 17, and 20, we find Father's sufficiency related arguments unavailing. However, with regard to Counts 4, 5, 6, 7, and 9, we agree that the evidence is insufficient to support a criminal contempt conviction on these counts.

### *Count 2: Violation of the Order to Enforce Summer Visitation*

Count 2 involves a violation of an order to enforce the Visitation Order rather than the Visitation Order itself. The trial court found with regard to Count 2 that the evidence established beyond a reasonable doubt that "Father violated the Order to Enforce Summer Visitation by willfully not allowing Grandparents to exercise Court-Ordered Summer Visitation with the child in 2021."

After the dispute involving the summer July 2021 visitation, discussed above in relation to Count 1, the Grandparents brought a motion to enforce the Visitation Order. Following a hearing on the motion on July 29, 2021, the trial court entered an Order to Enforce Summer Visitation on July 30, in which it ordered that the "Grandparents shall be, and are hereby, entitled to exercise summer visitation with the child from Friday, July 30, 2021, at 5:00 p.m. to Monday, August 9, 2021, at 5:00 p.m." This order was a clarification and enforcement of the Visitation Order that arose out of the dispute addressed above in the discussion of Count 1: Summer Visitation.

On July 29, after the hearing but before the order was entered, Grandfather sent a text to Father informing him that he intended to pick B.R.M. up at 5:00 p.m. the following day and provided an itinerary. Father responded, "No. I'll save you a trip. I'm not going to accommodate visitation outside of the dates you provided in May." Grandmother texted Father and asked whether Father had considered the new order. Father expressly acknowledged the trial court's new order but stated that requiring visitation on twenty-four hours' notice was, in his opinion, unjust. He again refused to allow the visitation, which did not take place.

In reviewing evidence under the applicable standard, the evidence presented supports Father's conviction for Count 2. Father clearly stated that he was aware of the requirements of the order to enforce but that he simply disagreed with the trial court's

decision, calling it "unjust" in a text to Grandfather.

On appeal, Father's argument that there is insufficient evidence to support his conviction is focused on timing. He argues that the order itself was not entered until the afternoon of July 30, the same day the trial court required the make-up visitation to begin. Under Father's theory, he was required to follow the Visitation Order's terms, which allowed summer visitation only for days proposed by the Grandparents by May 15, on the morning of July 29, but by the afternoon he had to change direction and follow the new order requiring visitation that day. According to Father, he could not be held in contempt under these circumstances.

In support of this conclusion, Father cites *Newport v. Newport*, for the proposition that one cannot be held in contempt for violating an order he did not know about. *See* No. 03A01-9712-JV-00543, 1998 WL 820765, at *2 (Tenn. Ct. App. Nov. 24, 1998). In *Newport*, this court reversed a contempt finding related to an order that *neither* party was even aware existed for nearly five years. *Id.* We do not find this case to be similar. Here, both parties attended the hearing on July 29. While there is no transcript of this hearing in the record, from other documentary evidence it appears that the trial court orally ruled and informed the parties that visitation would begin the following day at 5:00 p.m. Grandfather texted Father on July 29 to discuss picking B.R.M. the next day at 5:00 and Father's responses indicated that he was entirely aware of the requirements. Even if the written order only became effective on the afternoon of July 30 when the court entered it, Father—quite clearly—knew of its terms. He has provided no legal basis for a finding that he could not be held in contempt for violating an order just because he had less than 24 hours' notice. The proof in the record shows that Father admitted to knowing what the trial court ordered him to do and that he expressly refused to follow the court's order because he disagreed with it. Under the applicable standard, the record supports Father's conviction under Count 2.

*Count 3: Thanksgiving Visitation*

With regard to Count 3, the trial court found that Father willfully failed to comply with the Thanksgiving visitation provision of the Visitation Order. The proof at trial showed that on November 11, 2021, Grandfather texted the itinerary for the upcoming pre-Thanksgiving visitation set to begin on November 19. Not until November 18 did Father first question the Grandparents' plan to drive eight hours including at night from Kansas City to Tennessee. He refused to let B.R.M. go because he felt it was unsafe for the Grandparents to force her to sleep in the car overnight as they drove, even stating the day the visitation was set to begin that B.R.M. "will not be sleeping in a car this evening."

On appeal, Father concedes that he refused to let B.R.M. travel with Grandparents by car to Tennessee for the Thanksgiving visitation. Father argues that he was acting

reasonably when he questioned the safety of the plan to drive with B.R.M. in the car late at night. He points to the fact that he offered to let the Grandparents exercise their visitation locally. In his brief, Father states that because the Grandparents were "[u]nwilling to accept Father's reasonable proposed alternative," they "chose to forgo visitation."

This characterization does not align with the proof. Rather than Grandparents choosing to forego visitation, Father, himself, prohibited the Grandparents from exercising their visitation with B.R.M. because he thought he *should* have had some say in the transportation method. The Visitation Order states that "Grandparents shall be responsible for making any necessary transportation arrangements for [B.R.M.], and shall be responsible for all costs associated with transportation and visitation." Father did not seek judicial relief based upon concerns about the travel but instead acted unilaterally. Viewed in light of the applicable standard, the evidence supports that Father willfully refused to allow the visitation in direct violation of the Visitation Order. This was an "*intentional* violation of a known duty." *Beeler*, 387 S.W.3d at 523. Simply stated, under the applicable standard of review, the evidence supports Father's conviction under Count 3.

*Counts 4 and 9: Destination Asia Event and Curriculum Day*

As noted above, the Visitation Order imposes an obligation upon Father in connection with providing information to Grandparents regarding B.R.M.'s extracurricular activities. Specifically, the Visitation Order provides that

> 4. **Extracurricular Activities**. Upon written request from Grandparents, Father shall promptly provide to Grandparents an updated written schedule of [B.R.M.'s] extracurricular activities which are open to attendance by the public or by family members, including sporting events, school functions such as Grandparents' Day, and Chapel. Grandparents shall provide to Father at least forty-eight (48) hours' written notice of their intent to attend any of [B.R.M.'s] extracurricular activities.

Father's criminal contempt convictions as to Counts 4, 5, 6, 7, 8, 9, and 10 all arise in connection with this extracurricular activities provision of the Visitation Order.

The evidence does not support a finding of willful violation of the Visitation Order with regard to Counts 4 and 9 for the same reason: there is no evidence that either event was an extracurricular activity. Regarding Count 4, the trial court found "beyond a reasonable doubt that Father violated the Court's Visitation Order by willfully failing to inform the Grandparents of the child's Destination Asia event at school." There is evidence that Destination Asia is a school event, but problematically, there is no evidence in the record indicating the nature of the "Destination Asia event at school." It is far from

- 29 -

clear from the title alone that "Destination Asia" is an extracurricular activity rather than a curricular or co-curricular activity. This is of significance because Father was required under the Visitation Order to provide information related to extracurricular activities. There is no requirement in the Visitation Order for Father to provide information related to curricular or co-curricular events.

Grandfather conceded on cross-examination he lacked any personal knowledge as to what the "Destination Asia" event was, and no other evidence was presented that would allow a finding that this event was an extracurricular activity rather than a curricular or co-curricular activity. Accordingly, we conclude the evidence presented does not establish that Father willfully violated the Visitation Order with regard to the "Destination Asia event" at B.R.M.'s school.

Similarly, the trial court found "beyond a reasonable doubt that Father violated the Court's Visitation Order by willfully failing to inform Grandparents of the child's Curriculum Day school event, which took place on September 15, 2021." As with "Destination Asia," there is no evidence in the record to explain what "Curriculum Day" is at B.R.M.'s school. The title of the event itself strongly suggests that it is not an extracurricular activity but rather a curricular or co-curricular activity. As noted above, the Visitation Order does not require Father to provide information regarding curricular or co-curricular activities but instead extracurricular activities. Accordingly, we conclude that the evidence presented does not establish beyond a reasonable doubt that Father willfully violated the Visitation Order with regard to the "Curriculum Day" event at B.R.M.'s school. Regarding curricular or co-curricular events, at a minimum application to such circumstances would be predicated upon an ambiguous rather than clear violation of the terms of Visitation Order, thus these counts also fail in accordance with the ambiguity rationale addressed in section IV.

*Count 5: Spring Soccer Schedule*

Regarding Count 5, the trial court found "beyond a reasonable doubt that Father violated the Court's Visitation Order by willfully failing to provide the child's spring soccer schedule to Grandparents." It is undisputed, however, that Father typed up a schedule for B.R.M.'s spring soccer games and sent that spring soccer game schedule to Grandparents. In their petition for contempt, Grandparents conceded as much, and the evidence presented indicated that Father did so. With regard to the violation in the contempt petition, Grandparents instead asserted that the schedule they received from Father had the wrong times for the games. The Grandparents also alleged that Father had deliberately provided them with the wrong times. Relatedly, the Grandparents asserted in their contempt petition that there was an official spring soccer schedule and that Father had withheld it.

On this latter point, regarding the existence of a complete official season spring

soccer schedule with the times of B.R.M.'s games, no evidence was presented at trial. Furthermore, the trial court made no findings in connection with the actual asserted bases of violation under Count 5. Instead, as noted above, the trial court simply found that Father failed to provide the spring soccer schedule to Grandparents. The trial court did not find that Father willfully provided the wrong times nor did the trial court find that Father had access to an official schedule that he willfully failed to provide. Given the allegations in the petition and the evidence that was presented in relation to Count 5, the trial court's findings on Count 5 are insufficient to support a finding of a willful violation of the Visitation Order as to Count 5.

*Count 6: Fall Soccer Schedule*

Regarding Count 6, the trial court found "beyond a reasonable doubt that Father violated the Court's Visitation Order by willfully failing to promptly provide the child's fall soccer schedule to Grandparents." There is no dispute that Father did provide the Grandparents with a fall soccer schedule. The critical basis for the trial court's finding of contempt on this ground is the trial court's determination that Father did not provide this schedule *promptly*.

The Visitation Order expressly requires Father to act promptly in providing a written schedule to Grandparents. Text communications between Grandfather and Father provide that on August 31, 2021, Grandfather asked Father for B.R.M.'s "soccer info." That same day, Father responded, "I don't have the soccer schedule yet." Sometime before the evening of September 8, 2021, Grandfather searched online and found what appeared to be information indicating a start date for B.R.M.'s soccer league but not the times of her games. He contacted Father on the evening of September 8, stating "48hr notice of intent to attend Rosie's first soccer game Saturday, but don't know time: Haven't received a copy of schedule from you. You want us to obtain from your mom?" Father responded the same evening by providing the schedule and with a statement "Enjoy it while you can." Grandfather did not testify as to when he found the information about the start date for B.R.M.'s soccer league online or what other scheduling information appeared online regarding the soccer league, if any. Nine days before Father sent the schedule he indicated that he did not "have the soccer schedule yet." Sometime between that date and when Grandfather contacted Father on the evening of September 8, 2021, Father apparently obtained the soccer schedule. There is no testimony whatsoever as to when this occurred. On cross-examination, Grandfather conceded that he did not know when Father received the fall soccer schedule. Given the dearth of evidence regarding when Father received the schedule or even when it became available to him, the evidence does not support a finding that Father willfully failed to *promptly* provide the fall soccer schedule to Grandparents.

*Count 7: Swim Schedule*

Regarding Count 7, the trial court found "beyond a reasonable doubt that Father violated the Court's Visitation Order by willfully failing to provide the child's swimming schedule to Grandparents." The evidence, however, is undisputed that for the time period at issue, the Swim Club where B.R.M. took swimming had a restrictive Covid policy in place that at minimum prohibited attendance at practices. Furthermore, text message communication from Father to Grandfather indicated that B.R.M. had no actual swim meets. Grandfather conceded to having no knowledge that any actual swim meets occurred or that any swim meets that did occur were open to the public.

Father was required to provide scheduling information for "extracurricular activities which are open to attendance by the public or by family members." There is no requirement under the Visitation Order for Father to provide a schedule for extracurricular activities that are not open to the public or family members. There is no evidence in the record supporting the conclusion that B.R.M.'s swim practices were open to the public. To the contrary, the evidence clearly indicates that public attendance and even family attendance was strictly prohibited under the Covid policy that was then in place. Even assuming that the Swim Club had a different Covid policy for swim meets than for practices, an assumption that was not supported by any testimony, there is no evidence in the record indicating that B.R.M. had any swim meets during the time period at issue. Accordingly, the evidence does not support that Father willfully violated the Visitation Order by failing to provide the swim schedule.

*Count 8: Winter Basketball*

Regarding Count 8, the trial court found "beyond a reasonable doubt that Father violated the Court's Visitation Order by willfully failing to promptly provide the child's winter basketball schedule to Grandparents for the 2021-2022 season." Father raises a number of interrelated challenges to the sufficiency of the evidence to support a conviction under Count 8. Father notes that he did provide a basketball schedule on February 1, 2022, in response to a written request from Grandfather made the day before and thus asserts that he promptly provided the schedule in response to a written request from Grandparents made the day before.

Grandfather, however, made a written request for information about B.R.M.'s extracurricular activities in mid-November of 2021. Father acknowledged that B.R.M. was participating in basketball, indicating "I'll forward you her basketball schedule as soon as it's finalized." Father did not send any such schedule until February of 2022, in response to the January 31, 2022 follow-up from Grandparents, and at that point the Grandparents had already unfortunately missed four of B.R.M.'s basketball games. While Father argues that it is not clear when he received the schedule, under the applicable standard of review, a rational trier of fact could have found that Father, faced with a request from Grandparents, failed to promptly provide B.R.M.'s winter basketball schedule for the 2021-22 season, or at a minimum the schedule as to the four games that

had already passed.

*Count 10: School Carnival*

Regarding Count 10, the trial court found "beyond a reasonable doubt that Father violated the Court's Visitation Order by willfully failing to inform Grandparents of the School Carnival that took place at the child's school in September of 2021." On appeal, Father argues that no proof was presented that he was aware of this event, the time of this event, or that it was open to families. We cannot agree with Father's contentions. Under the Visitation Order, Grandparents were scheduled to pick up B.R.M. at 3:00 p.m. on the same date of the Carnival. Father informed Grandparents that B.R.M. would not, however, be available for pick up until 5:00 p.m. Father informed the Grandparents of this change in the schedule but not the reason for the change, which ended up being B.R.M. going to the School Carnival. Additionally, the evidence indicated that B.R.M.'s paternal grandmother went to the event. Viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in favor of conviction, as we required to do under the applicable standard, a rational trier of fact could conclude Father was aware of the event, when it was, and that is was open to families, but, nevertheless, failed to provide information about the School Carnival despite knowledge that Grandparents were going to be in town and despite their written requests for information regarding B.RM.'s extracurricular activities.

*Counts 12, 16, 17, and 20: Missed FaceTime Calls*

With regard to the FaceTime call related counts, Father argues that there is insufficient proof with regard to willfulness and intentionality. Father's argument, in part, is grounded in his assertion that he was not required to place the FaceTime calls himself. We have already reversed Counts 11, 13, 14, 15, 18, and 19 based upon an ambiguity of the Visitation Order in connection with whether the requirement to "facilitate" the calls required Father to place them.[15] With regard to Count 16, Father also notes that his parents were not willing to assist with the call and that he was traveling and told Grandparents he would be back in touch. Father contends under the Visitation Order he had no duty to get someone else to facilitate the calls when he was unavailable to do so. Primarily, Father's argument is predicated upon a lack of evidentiary support to show that these FaceTime failures were willful or intentional.

With regard to the latter point, under the applicable standard, the record supports the trial court's conclusion that Father's actions constituted a failure to facilitate the FaceTime calls in relation to Counts 12, 16, 17, and 20. With regard to Father's specific

---

[15] Having concluded that Counts 11, 13, 14, 15, 18, and 19 are to be reversed in connection with ambiguity of application of the Visitation Order to these circumstances, we pretermit consideration of evidentiary sufficiency as to these counts.

argument as to Count 16, Father, not his parents, had a duty to facilitate the FaceTime call under the terms of the Visitation Order. Even if we were to accept Father's contention, Father informed Grandparents that he would be back in touch regarding this call and failed to fulfill his assurances to them that he would do so. We conclude that a rational trier of fact could have found beyond a reasonable doubt that Father failed to facilitate FaceTime calls in Counts 12, 16, 17, and 20 by not responding to Grandparents' text messages asking to conduct the calls and by his actions in Count 16.

*Counts 21-23: Failure to Appear*

Counts 21, 22, and 23 all relate to Father's failure to appear in response to court orders to do so. With regard to Count 21, the trial court found "Father willfully failed to abide by the Court's Order to Appear and that each and every element of criminal contempt has been met beyond a reasonable doubt as to the violation of the February 3, 2022, Order to Appear." For Count 22, the trial court found that "Father willfully failed to abide by the Court's Order to Appear and that each and every element of criminal contempt has been met beyond a reasonable doubt as to the violation of the February 15, 2022, Order to Appear." As for Count 23, the trial found that "Father willfully failed to abide by the Court's Order to Appear and that each and every element of criminal contempt has been met beyond a reasonable doubt as to the violation of the March 12, 2022, Order to Appear."

Father challenges the sufficiency of the evidence to support convictions for Counts 21–23. His focus in arguing insufficiency as to these counts is limited to challenging the adequacy of testimony from Grandmother to address the reasons for Father's failure to appear.

The argument, however, misses the mark. The basis for the trial court's conclusion is plainly grounded, not upon Grandmother's testimony, but upon proper notice being provided to Father in relation to the trial court's orders to appear that underlie Counts 21-23. In addition to findings related to the notice that was provided in relation to each order to appear, the trial court also addressed Father's absence at each of these proceedings and as to each missed appearance noted that "[t]here was no phone call, no letter, no email, no notice, nothing to let the Court know that Father would not be present."

Tennessee courts have recognized that intent may be inferred. *See*, *e.g.*, *State v. Buggs*, 995 S.W.2d 102, 108 (Tenn. 1999). In the context of criminal failure to appear under Tennessee Code Annotated section 39-16-609, evidence of notice being afforded, coupled with failure to actually appear, constitutes a sufficient basis for affirming a conviction for failure to appear. *State v. Sprague*, No. E2010-00288-CCA-R3-CD, 2011 WL 3329814, at *4 (Tenn. Crim. App. Aug. 3, 2011); *State v. Whittaker*, No. M2008-02859-CCA-R3-CD, 2010 WL 744397, at *5 (Tenn. Crim. App. Mar. 2, 2010); *State v.*

*Williams*, No. W2009-00024-CCA-R3-CD, 2009 WL 3103824, at *3-4 (Tenn. Crim. App. Sept. 28, 2009); *State v. Dunnorm*, No. E2006-00366-CCA-R3-CD, 2007 WL 152542, at *2-3 (Tenn. Crim. App. Jan. 22, 2007). Nor are Tennessee courts alone in such an approach. *See*, *e.g.*, *Harper v. Commonwealth*, 885 S.E.2d 467, 476 (2023) (quoting *Chavez v. Commonwealth*, 817 S.E.2d 330 (2018)) (noting that "proof of timely notice simply provides a prima facie basis for finding that the element of willful failure to appear has been proven"); 8A Am. Jur. 2d Bail and Recognizance § 170 (stating that "when the government proves that an accused received timely notice of when and where to appear for trial and the accused then fails to appear, the fact finder may infer that the failure to appear was willful"); 8 C.J.S. Bail § 141 (indicating that "[i[f the government proves that an accused received timely notice of when and where to appear for trial, and thereafter did not appear on the date or place specified, the fact finder may infer that the failure to appear was willful"). In a related context, with regard to citations, the Tennessee General Assembly has expressly provided that "[p]roof that the defendant failed to appear when required constitutes prima facie evidence that the failure to appear is willful." Tenn. Code Ann. § 40-7-118(j). It is clear under Tennessee law that a defendant must be afforded notice and an opportunity to be heard in relation to criminal contempt based upon failure to appear. *See*, *e.g.*, *Bailey v. Crum*, 183 S.W.3d 383, 387-89 (Tenn. Ct. App. 2005). Father was afforded such notice and an opportunity.

The trial court in present case took the prima facie presumption of Tennessee criminal misdemeanor failure to appear and applied it in the context of criminal contempt for failure to appear in response to a court order. Father did not present before the trial court evidence to pierce the prima facie notice-based presumption, either through his own testimony or other evidence. Father, despite the trial court's ruling as to Counts 21, 22, and 23 being grounded upon a finding as to notice, has not challenged this approach or developed an argument in opposition to it. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010). Accordingly, we decline to delve deeper into these waters in considering the trial court's approach.

VI.

Next, Father argues there were material notice defects indicating the nature of the proceedings as being criminal in nature that precluded a guilty verdict as to any counts of criminal contempt. Among the voluminous filings in this matter, Father points to three defects. One, Father notes that "Grandparents' 'Notice of Constitutional Rights' misadvised Father that the charges 'could result in your incarceration in the Davidson County Jail for a period of at least ten (10) days for each count of criminal contempt for which you are found guilty, plus a fine as the Court deems appropriate.'" Two, the trial court in pretrial orders directed Father to "show cause" as to why he should not be held in contempt. Three, the bodily attachment order of April 5, 2022, an order that did not form the basis of one of the criminal contempt counts, referred to civil rather than criminal

contempt.

Tennessee Rule of Criminal Procedure 42 requires that a defendant be given notice, either oral or written, of the charges and upcoming hearing. This notice must include the time and place of the hearing, allow the defendant a reasonable time to prepare a defense, and state the essential facts constituting the criminal contempt charge. Tenn. R. Crim. P. 42(b)(1). The notice must "(1) allow the accused to glean that he or she is being charged with a crime, rather than being sued by an individual, (2) enable the accused to understand that the object of the charge is punishment—not merely to secure compliance with a previously existing order, and (3) sufficiently aid the accused to determine the nature of the accusation, which encompasses the requirement that the underlying court order allegedly violated by the accused is itself clear and unambiguous. *McClain v. McClain*, 539 S.W.3d 170, 219 (Tenn. Ct. App. 2017) (quoting *McLean v. McLean*, No. E2008-02796-COA-R3-CV, 2010 WL 2160752, at *5 (Tenn. Ct. App. May 28, 2010)).

The Grandparents' Criminal Contempt Petition repeatedly and consistently uses the term "criminal contempt" for each of the 20 counts pled. Additionally, the Petition clearly states that Grandparents are requesting "[t]hat at a hearing on this matter, the [trial court] find Father guilty of 20 counts of willful criminal contempt of the order of [the trial court] and that he be incarcerated for 10 days for each count. . . ." The record also shows that by the time the court entered the errant April 5 order that referenced civil contempt, Father had already received the Grandparents' February 2 petition for criminal contempt, the court's February 3 order to appear, the February 15 bodily attachment order, the March 13 second bodily attachment order, and the April 1st third bodily attachment order, all of which correctly identify that Father is facing criminal contempt charges and potential incarceration. Grandparents also point to the fact that Father filed a motion to dismiss the criminal contempt petition and the trial court held a hearing on the matter on May 23, 2022, several months before the criminal contempt trial. In its written order following the hearing, the trial court explained that Father responded affirmatively to inquiries about whether he had received the criminal contempt petition and understood his rights. Father then entered a plea of "not guilty" through his attorney.

Ultimately, while Father is undoubtedly correct that there were several misstatements, we agree with Grandparents that Father was put on sufficient notice. The record does not support a misunderstanding of the nature of these proceedings; adequate notice was provided.

VII.

Addressing his right to trial by jury, Father argues that his conviction violates his rights under the United States Constitution and the Tennessee Constitution. He argues that the nature of the right to trial by jury in the context of criminal contempt proceedings

is unsettled, and he argues under the state and federal Constitutions for the adoption of an understanding of one or both thereof as providing "that a criminal contempt sentence that exceeds six months and carries a term of actual incarceration must follow a conviction by jury." Having reversed Father's convictions as to 12 counts, the maximum potential sentence that could be imposed on remand is now less than six months. Accordingly, we pretermit discussion of this issue.

VIII.

After finding Father guilty on all 23 Counts, the court sentenced Father to the maximum sentence of ten days for every one of the twenty-three Counts. The court also held that each ten-day sentence would be served consecutively, rather than concurrently. In total, the trial court sentenced Father to 230 days, with 90 of those being actual incarceration.

Father challenges both the application of the maximum ten-day sentence and the order that the sentences be served consecutively. He argues that the sentences were excessive and the imposition of consecutive sentences unwarranted. Father also asserts that the trial court failed to consider the applicable statutory factors with regard to both its decision to impose the maximum sentence as to each count and its decision to impose consecutive sentencing. Additionally, he asserts that the trial court's findings of fact and conclusions of law are insufficient to support the imposition of the sentences imposed by the trial court in the present case.

Tennessee appellate courts review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

When sentencing for criminal contempt convictions, this court has indicated that trial courts should look to Tennessee Code Annotated section 40-30-103. *Simpkins*, 374 S.W.3d 413, 423-24 (Tenn. Ct. App. 2012). The statute states:

(1) Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness

- 37 -

of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant;

(2) The sentence imposed should be no greater than that deserved for the offense committed;

(3) Inequalities in sentences that are unrelated to a purpose of this chapter should be avoided;

(4) The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed;

(5) The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. The length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence;

(6) Trial judges are encouraged to use alternatives to incarceration that include requirements of reparation, victim compensation, community service or all of these; and

(7) Available community-based alternatives to confinement and the benefits that imposing such alternatives may provide to the community should be considered when the offense is nonviolent and the defendant is the primary caregiver of a dependent child.

Tenn. Code Ann. § 40-35-103.

In addition, the trial court must determine whether the given sentences should be served concurrently or consecutively. In doing so, a trial court should consider the criteria listed in Tennessee Code Annotated section 40-35-115(a). *Burris v. Burris*, 512 S.W.3d 239, 256 (Tenn. Ct. App. 2016) (citing *Simpkins*, 374 S.W.3d at 424). Furthermore, "there is a presumption in favor of concurrent sentencing as distinguished from consecutive sentencing." *Id.* Tennessee Code Annotated section 40-35-115(a) states:

(a) If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.

(b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation;

(7) The defendant is sentenced for criminal contempt; or

(8) The defendant is convicted of two (2) or more offenses involving sexual exploitation of an elderly or vulnerable adult with consideration of the aggravating circumstances arising from the relationship between the defendant and victim, the nature and scope of the sexual acts, and the extent of the physical and mental damage to the victim.

Tenn. Code Ann. § 40-35-115 (2022).

This court confronted a strikingly similar circumstance to the present case in *Welch v. Welch*, No. W2022-00227-COA-R3-CV, 2024 WL 3581304 (Tenn. Ct. App. July 30, 2024). Therein, we stated the following:

> . . . Husband faults the trial court for not making sufficient findings of fact and conclusions of law with respect to sentencing considerations. Determining the appropriate sentence is guided by principles set forth in the Tennessee Criminal Sentencing Reform Act of 1989. *In re Sneed*, 302 S.W3d [825,] 828 [Tenn. 2010]; *Simpkins v. Simpkins*, 374 S.W.3d 413, 422 (Tenn. Ct. App. 2012). Courts first should look to the sentencing considerations set forth in Tennessee Code Annotated § 40-35-103. *Simpkins*, 374 S.W.3d at 423. Where, as here, the party has been found in criminal contempt and sentenced on multiple counts, the court next "must determine whether the sentences run consecutively or concurrently to one another." *In re Sneed*, 302 S.W.3d at 828; *see also Simpkins*, 374 S.W.3d at 422-23. Sentences may run consecutively if the court finds by a preponderance of the evidence that "certain criteria enumerated in Tennessee Code Annotated section 40-35-115(b) are present." *In re Sneed*, 302 S.W.3d at 828. But concurrent sentencing is favored. *See Simpkins*, 374 S.W.3d at 424 (citing *State v. Taylor*, 739 S.W.2d 227, 230 (Tenn. 1987)).
>
> Here, the court did not reference any of the statutory factors in imposing a sentence or in determining that the sentence should run consecutively. Although sentencing is reviewed under an abuse of discretion standard, "[d]iscretionary decisions must take the applicable law . . . into account." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). We could examine the applicable factors based on the record, especially given that credibility determinations are unnecessary. But, because we have determined that the evidence was insufficient on two of the five counts for which Husband was sentenced and the trial court suspended a significant portion of the original sentence, we vacate the sentence of imprisonment. And we remand for the imposition of a new sentence in light of the statutory factors and the counts that have been affirmed.

*Welch*, 2024 WL 3581304 at *7-8.

As noted above, the circumstances of the present case are strikingly similar to those in *Welch*. Here, the trial court imposed the maximum sentences and consecutive sentencing. The trial court did so without the record reflecting consideration of the appropriate statutory-based considerations. The trial court suspended a significant portion of the sentence that it imposed. This court on appeal has affirmed Father's

- 40 -

convictions as to multiple counts but reversed the majority of the counts of criminal contempt.

We conclude the prudent course with regard to sentencing in the present case is to follow the approach set forth in *Welch*. We vacate the sentence imposed by the trial court and remand for resentencing as to the counts which have been affirmed, in light of the relevant statutory factors.[16]

IX.

For these reasons, we reverse the guilty verdict as to Counts 1, 4, 5, 6, 7, 9, 11, 13, 14, 15, 18, and 19. We uphold the verdicts as to Counts 2, 3, 8, 10, 12, 16, 17, 20, 21, 22, and 23. We vacate the sentences imposed by the trial court and remand for resentencing as to the Counts that have been affirmed in light of the relevant statutory factors.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE

---

[16] In his reply brief, Father argues that Counts 1-3 are now moot because he ended up serving more than 30 days in jail after the trial court ordered that the sentence be served after the filing of this appeal. On June 9, 2023, Father filed a Tennessee Rule of Appellate Procedure Rule 8(a) motion for his release after the trial court denied bail, which this court granted on June 12, 2023. Based on that, he asks this court to find that the first 3 Counts in this case are moot and also requests that they be dismissed. It is not entirely clear from the record whether the jail time was in relation to the offenses at issue in this case or in a separate contempt proceeding in which the trial court found other grounds of criminal contempt. From the record available on appeal, the circumstances surrounding this matter are opaque. It is not apparent to us why mootness or dismissal would be warranted in relation to these Counts. Having elected to remand for resentencing and having reversed Father's conviction as to Count 1, this matter is something that is better addressed on remand.